Eastern District of Kentucky
FILED

JAN - 2 2026

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF KENTUCKY

# LEXINGTON DIVISION

---

**William Bolt, agent /**

WILLIAM MATTHEW BOLT, principal;

**Plaintiff,**

Case No.: 6:26- cv-54-CHB

v.

CITY OF HARLAN, KENTUCKY;

WINSTON H. "WINK" YEARY JR., individually and in his official capacity as City of Harlan, Kentucky, Chief of Police;

JOHN DOE OFFICERS 1-2, individually and in their official capacities as City of Harlan, Kentucky, Police Officers;

HARLAN COUNTY, KENTUCKY;

BJ BURKHART, individually and in his official capacity as Harlan County Jailer;

JOHN DOE JAILER "JJ", individually and in his official capacity;

JANE DOE JAILER, individually and in her official capacity;

JOHN DOE JAILERS 2-6, individually and in their official capacities;

JOHN DOE SHERIFF DEPUTY, individually and in his official capacity

HUDDLE HOUSE, INC.;

JANE DOE HUDDLE HOUSE MANAGER;

COLES AUTOBODY AND TOWING;

JOHN DOE DEFENDANTS 7 - 12,

**Defendants.**

Harlan, Kentucky, Federal Complaint ( Bolt v. Commonwealth (KY))          Page **1** of 56

## COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS, TORTURE, SEXUAL ASSAULT, RACKETEERING, AND ATTEMPTED MURDER

42 U.S.C. § 1983 - (Civil action for Deprivation of Rights Under Color of Law);

18 U.S.C. § 2340A - (Torture - Civil Basis);

18 U.S.C. § 242 – (Deprivation of Rights Under Color of Law);

RICO - 18 U.S.C. § 1962(c) & (d) - (Extortion (Hobbs Act), Kidnapping, Torture, Deprivation of Rights Under Color of Law)

---

## DEMAND FOR JURY TRIAL

---

## NOTICE OF SPECIAL APPEARANCE, STATUS, AND INTENT

Plaintiff William Bolt appears specially and not generally, and in his capacity as agent and trustee for the purpose of protecting rights and seeking redress, WITHOUT waiving any jurisdictional challenges or rights. This special appearance is made to contest unlawful actions taken WITHOUT jurisdiction and to preserve all rights under common law, constitutional law, and the law of nations. Plaintiff appears Pro Se, In Propria Persona, and Sui Juris.

William Bolt is a living man, he bleeds if he is cut, and a freeman of the Union. William Bolt is NOT a corporate fiction, artificial entity, corporation, animal, ship, cargo, or any other fiction as such. William Bolt acts as agent and trustee for WILLIAM MATTHEW BOLT (an ens legis, commercial entity, sole proprietorship). The GNARLEY Ministry Trust is a separate legal entity and property owner of which Defendants trespassed, and of which William Bolt is a trustee. William Bolt is Sultan of the Nation of GNAR and Ambassador of both the Nation of GNAR and the Nation of Pluto Coalition, which are foreign governments at peace with the corporation "United States" per 18 U.S.C. § 11. William Bolt is a non-citizen national as defined by 8 U.S.C. § 1101(a)(14), an internationally protected person, and operates WITHOUT the "United States" at all times pursuant to 28 U.S.C. § 3002(15)(A) and UCC 9-307(h).

All actions taken by Defendants were WITHOUT jurisdiction, WITHOUT consent, and constitute unlawful trespass upon William Bolt's person, property, and rights, as well as trespass of Trust owned and managed property. William Bolt reserves all his rights, WITHOUT prejudice, pursuant to UCC 1-308.

---

## A. NATURE OF THE ACTION

1. This is a civil rights action arising under 42 U.S.C. § 1983, the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and state common law. Plaintiff seeks compensatory and punitive damages, declaratory relief, and injunctive relief for torture, chemical weapon assault, sexual assault, attempted murder, false arrest, excessive force, deliberate indifference to serious medical needs, violations of due process, equal protection violations, conspiracy to violate civil rights, racketeering, and related state law torts.

2. On October 16, 2025, Plaintiff William Bolt was unlawfully seized, arrested, and detained by Defendants without jurisdiction, without due process, without probable cause, and without lawful authority. Over the following twenty (20) hours, Plaintiff was subjected to torture including chemical weapon assault with oleoresin capsicum (OC) spray, applied at point-blank range to Plaintiff's face. Twelve (12) hours of continuous restraint in a restraint chair causing severe physical injury, deliberate denial of medical care despite life-threatening symptoms, sexual torture, dehumanizing treatment, and psychological torture, cumulative and egregious acts equating to attempted murder.

3. The torture and abuse inflicted upon Plaintiff satisfy the definition of torture under 18 U.S.C. § 2340A and constitute severe violations of clearly established constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments. Defendants acted with deliberate indifference, malice, and sadistic intent to cause harm.

4. Plaintiff seeks ONE HUNDRED AND TWO MILLION U.S. DOLLARS ($102,000,000.00) in compensatory and punitive damages, plus declaratory and injunctive relief.

5. Plaintiff seeks TWELVE MILLION FOUR HUNDRED AND EIGHTY THOUSAND U.S. DOLLARS ($12,480,000.00) in breach of contract damages, plus interest and any additional relief.

6. Total without RICO: ($102,000,000) + ($12,480,000) = ($114,480,000.00)
ONE HUNDRED AND FOURTEEN MILLION FOUR HUNDRED AND
EIGHTY THOUSAND U.S. DOLLARS

7. RICO - 18 U.S.C. § 1962(c) & (d) applied: ($102,000,000 X 3) = ($306,000,000.00 )
THREE HUNDRED AND SIX MILLION U.S. DOLLARS

8. GRAND TOTAL INCLUDED IN THIS SUIT IS: THREE HUNDRED AND
EIGHTEEN MILLION FOUR HUNDRED AND EIGHTY THOUSAND U.S.
DOLLARS ($318,480,000.00)

## B. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal
question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). This action
arises under 42 U.S.C. § 1983 and the United States Constitution.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to
28 U.S.C. § 1367.

3. Venue is proper in the Eastern District of Kentucky pursuant to 28 U.S.C. § 1391(b)
because all or a substantial part of the events giving rise to the claims occurred in
Harlan County, Kentucky, within this judicial district.

## C. PARTIES

### (a). Plaintiff

1. William Bolt is a living man, freeman of the Union, and non-citizen national as
defined by 8 U.S.C. § 1101(a)(14). William Bolt operates as agent and trustee for
WILLIAM MATTHEW BOLT, an ens legis commercial entity organized as a
sole proprietorship under 26 U.S.C. § 7701(a)(1).

2. William Bolt is Sultan of the Nation of GNAR, a foreign government at peace with
the corporation "United States" as defined by 18 U.S.C. § 11. William Bolt is also
Ambassador of the Nation of GNAR and Ambassador of the Nation of Pluto
Coalition, both foreign governments at peace with the corporation
"United States."

3. As Ambassador of foreign governments, William Bolt is an internationally protected
person entitled to special protections under the law of nations and treaty
obligations of the United States.

4. William Bolt operates WITHOUT the territorial jurisdiction of the "United States" (as defined by 28 U.S.C. § 3002(15)(A)) at all times, and is not subject to the jurisdiction of the corporation "United States" or its subdivisions except where specifically consented to by treaty or agreement.

5. The GNARLEY Ministry Trust is a separate entity that owns property including the automobile in which William Bolt was traveling, on October 16, 2025.

6. WILLIAM MATTHEW BOLT is the principal ens legis entity for which William Bolt serves as agent and trustee, and is the "person" for purposes of 26 U.S.C. § 7701(a)(1).

7. At all relevant times, Plaintiff was acting in his capacity as agent and trustee, Ambassador-At-Large, Sultan, non-citizen national, and internationally protected person.

## (b). Defendants
### (i). City of Harlan and Harlan City Police

1. Defendant CITY OF HARLAN, KENTUCKY is a municipal corporation and political subdivision of the Commonwealth of Kentucky. The City of Harlan operates the Harlan City Police Department and is responsible for the policies, practices, customs, and training of its police officers.

2. The City of Harlan is sued pursuant to Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), for maintaining policies, customs, and practices that caused the violations of Plaintiff's constitutional rights, including:
   (a) Failure to train officers on jurisdictional requirements before arrest;
   (b) Failure to train officers on constitutional rights of non-citizen nationals;
   (c) Failure to train officers on internationally protected persons;
   (d) Failure to establish policies requiring officers to investigate jurisdiction when indicators of special status are present;
   (e) Policy or custom of arresting individuals based solely on alleged code violations without establishing jurisdictional foundation;
   (f) Deliberate indifference to the need for adequate training on use of force;
   (g) Failure to discipline officers for constitutional violations;
   (h) Pattern and practice of excessive force and constitutional violations.

3. Defendant WINSTON H. "WINK" YEARY JR. is sued in his individual and official capacity as Chief of Police for the City of Harlan. Chief Yeary personally participated in Plaintiff's torture by appearing during Plaintiff's release on October

17, 2025, stood by and did nothing as another agent ripping paperwork from Plaintiff's hands, and threatening Plaintiff with additional torture including: "We'll call the judge, revoke your bail, and you'll be OC'd again...or worse."

4. Chief Yeary is responsible for establishing policies, training, and supervision of Harlan City Police officers. Chief Yeary's deliberate indifference to the need for proper training and his personal participation in threatening Plaintiff with additional torture make him individually liable.

5. Chief Yeary's personal appearance and threats during Plaintiff's forced processing and then hours later at Plaintiff's release, demonstrate knowledge of and acquiescence to the torture inflicted upon Plaintiff, and constitute a policy or custom of the Harlan City Police Department, which had direct supervision and approval from the high ranking official, Chief Yeary.

6. Defendants JOHN DOE OFFICERS 1-2 are Harlan City Police officers whose identities are currently unknown to Plaintiff. These officers conducted the initial traffic stop, arrest, and transportation of Plaintiff on October 16, 2025. Their identities will be determined through discovery.

7. These officers are sued in their individual and official capacities for false arrest, excessive force, violations of due process, conspiracy to violate civil rights, and related constitutional and civil violations.

## (ii). Harlan County and Detention Center

1. Defendant HARLAN COUNTY, KENTUCKY is a political subdivision of the Commonwealth of Kentucky. Harlan County operates the Harlan County Detention Center and is responsible for the policies, practices, customs, and training of detention officers and staff.

2. Harlan County is sued pursuant to Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), for maintaining policies, customs, and practices that caused the violations of Plaintiff's constitutional rights, including:

(a) Using chemical weapons (OC spray) on restrained, non-resistant detainees;

(b) Using restraint chairs for extended periods (12+ hours) constituting torture;

(c) Failure to provide adequate medical care to detainees experiencing medical emergencies;

(d) Failure to train detention officers on constitutional limitations on use of force;

(e) Failure to train detention officers on medical care requirements;

(f) Failure to supervise detention officers to prevent torture and abuse;

(g) Deliberate indifference to known risks of serious harm to pretrial detainees;

(h) Pattern and practice of excessive force, torture, and denial of medical care.

3. Defendant BJ BURKHART is sued in his individual and official capacity as Harlan County Jailer. Jailer Burkhart is responsible for the operation, policies, and supervision of the Harlan County Detention Center and all detention officers.

4. Jailer Burkhart's deliberate indifference to the need for proper training, supervision, and policies to prevent torture makes him individually liable for the violations inflicted upon Plaintiff.

5. Defendant JOHN DOE JAILER "JJ" is a detention officer at Harlan County Detention Center who personally tortured Plaintiff. "JJ" is a white male, approximately 5'10" to 6'0" tall, medium build, who identified himself as "JJ" during the assault. "JJ" personally:

(a) Administered OC spray at point-blank range directly into Plaintiff's face;

(b) Administered OC spray to Plaintiff's genitals via contaminated water while Plaintiff was helplessly restrained;

(c) Participated in strapping Plaintiff into restraint chair;

(d) Mocked and taunted Plaintiff during torture;

(e) Called Plaintiff dehumanizing names;

(f) Threatened Plaintiff with additional violence.

6. "JJ" is sued in his individual and official capacity for torture, chemical weapon assault, sexual assault, excessive force, deliberate indifference to medical needs, cruel and unusual punishment, and related constitutional violations.

7. Defendant JANE DOE JAILER 1 is a female detention officer who personally participated in Plaintiff's torture by:

(a) Assisting in administering OC spray;

(b) Assisting in strapping Plaintiff into restraint chair;

(c) Applying contaminated water to Plaintiff's genitals containing OC spray residue;

(d) Denying Plaintiff's requests for medical assistance;

(e) Participating in forced strip search under threat of additional violence;

(f) Verbally assaulted Plaintiff, "my dogs are smarter than you"

8. Jane Doe Jailer 1 is sued in her individual and official capacity for torture, sexual assault, excessive force, deliberate indifference to medical needs, and related trespasses and constitutional violations.

9. Defendants JOHN DOE JAILERS 2-5 are additional detention officers who participated in Plaintiff's torture and abuse, including gang intimidation tactics with four (4) jailers simultaneously threatening Plaintiff with violence. Their identities will be determined through discovery.

### (iii). Private Entities

1. Defendant HUDDLE HOUSE, INC. is a restaurant corporation operating a location in Harlan, Kentucky where Plaintiff stopped for breakfast on October 16, 2025, approximately two (2) minutes before his unlawful arrest.

2. Huddle House staff called Harlan City Police to report Plaintiff based on false information or discriminatory animus, precipitating the unlawful arrest. Huddle House may be liable for conspiracy, defamation, and related state law torts.

3. Defendant COLES BODY SHOP is a business in Harlan, Kentucky whose property and/or personnel has been involved in events leading to Plaintiff's arrest. Plaintiff reserves the right to amend this complaint as additional facts are discovered.

4. JOHN DOE DEFENDANTS 1-10 are additional individuals or entities whose identities are currently unknown but who participated in or contributed to the violations of Plaintiff's rights. Their identities will be determined through discovery.

## D. FACTUAL ALLEGATIONS

### (a). Background - Plaintiff's Status

1. William Bolt is a living man, non-citizen national under 8 U.S.C. § 1101(a)(14), and freeman of the Union who has never voluntarily subjected himself to the territorial jurisdiction of the corporation "United States" as defined by 28 U.S.C. § 3002(15)(A).

2. William Bolt operates as agent, trustee, and beneficiary for WILLIAM MATTHEW BOLT, an ens legis commercial entity (sole proprietorship) that is the "person" for purposes of federal tax law under 26 U.S.C. § 7701(a)(1).

3. The GNARLEY Ministry Trust is a separate legal entity that owns property, including the automobile William Bolt was traveling in October 16, 2025.

4. William Bolt is Sultan of the Nation of GNAR. The Nation of GNAR is a foreign government at peace with the corporation "United States" within the meaning of 18 U.S.C. § 11.

5. William Bolt is Ambassador of the Nation of GNAR, authorized agent and Ambassador to represent the Nation of GNAR, as head of state, in dealings with other governments, or nations and/or entities and/or individuals. As Ambassador, William Bolt is an internationally protected person entitled to diplomatic courtesies and protections under international law.

6. William Bolt is also Ambassador of the Nation of Pluto Coalition, another foreign government at peace with the corporation "United States" per 18 U.S.C. § 11.

7. As Sultan and Ambassador of foreign nations, William Bolt's status is analogous to that of a head of state or diplomatic representative, entitling him to special protections and immunities.

8. William Bolt travels in the Union states, including Kentucky, as a freeman exercising his natural right to travel. The right to travel is a fundamental constitutional right recognized in Kent v. Dulles, 357 U.S. 116, 125 (1958), which held that "the right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." The GNARLEY Ministry Trust's automobile displays Diplomatic Ambassador At Large license plates that clearly indicate his status.

9. Under 8 U.S.C. § 1101(a)(14), a "national of the United States" means:
   "(A) a citizen of the United States, or
   (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." William Bolt is a non-citizen national—a person who owes permanent allegiance to the Union but is not a citizen of the corporation "United States."

10. Under 26 CFR 301.7701-11, William Bolt's tax treatment is separate from that of the commercial entity WILLIAM MATTHEW BOLT. William Bolt, as living man and agent, is responsible for reporting and managing the affairs of the ens legis entity.

11. The distinction between William Bolt (living man, agent, trustee, freeman, Sultan, Ambassador, non-citizen national) and WILLIAM MATTHEW BOLT (ens legis commercial entity, principal, sole proprietorship, "person") is fundamental to understanding the jurisdictional issues and unlawful actions of Defendants.

12. William Bolt operates WITHOUT the "United States" (corporation) at all times. Per 28 U.S.C. § 3002(15)(A), "United States" means "(A) a Federal corporation." William Bolt is not within the jurisdiction of this federal corporation except where specifically agreed by treaty or contract.

13. Under UCC 9-307(h), "The United States is located in the District of Columbia." William Bolt was in Kentucky, one of the Union states, NOT within "the United States" (federal corporation's territorial jurisdiction limited to District of Columbia, federal enclaves, territories, and possessions).

14. At all times relevant to this action, William Bolt was operating in his capacity as agent and trustee, Ambassador, Sultan, non-citizen national, internationally protected person, and freeman of the Union.

15. All rights are reserved WITHOUT prejudice pursuant to UCC 1-308 (formerly UCC 1-207), which provides: "A party who with explicit reservation of rights performs or promises performance or asserts to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved."

## (b). October 16, 2025 - Morning Travel and Huddle House Stop

1. On the day of October 16, 2025, William Bolt was traveling peacefully through Harlan County, Kentucky with his wife, Alice Cox.

2. William Bolt and Alice Cox were traveling in an automobile owned by the GNARLEY Ministry Trust. The automobile displayed Diplomatic Ambassador At Large license plates, clearly visible and indicating William Bolt's status.

3. At approximately 4:00 p.m. Eastern Time, William Bolt and Alice Cox stopped at Huddle House restaurant in Harlan, Kentucky for a late lunch. Alice Cox had never been to a Huddle House but had heard William talk about it and always gave them praise on their waffles. This was a peaceful stop during their travel.

4. William Bolt and Alice Cox entered the Huddle House, ordered lunch and had a small discrepancy over how it took almost an hour for William to get his waffle, eggs and sausage that he ordered while his wife (Alice Cox) got her philly cheese sandwich and fries in about 20 minutes and ate it slowly, trying to wait until William Bolt got his food so they could eat together instead of taking turns watching each other eat. Alice Cox finished eating and still had to wait a few minutes for William Bolt's food to come out.

5. After William Bolt finished his food they charged William Bolt and Alice Cox an extra 15 dollars for exchanging bacon for sausage in his meal. William Bolt and Alice Cox spoke to the waitress and was told she was unable to fix the problem

but wanted to fix it due to the long wait they already endured and informed them that only the manager could make those types of transactions, but made no effort to call the manager and just informed the two that she was not there at the moment.

6. William Bolt and Alice Cox started to leave Huddle House but the situation didn't sit right for either William Bolt or Alice Cox so William Bolt calmly reentered Huddle House and politely requested for the manager.

7. While waiting for the manager to arrive one of the other customers of Huddle House who had a to-go order, started talking with William Bolt on an unrelated subject about horses. Their talk continued until William Bolt and Alice Cox left Huddle House.

8. An estimated 10 minutes before she arrived, when the manager finally showed up, William Bolt paused conversation with other Huddle House customer and approached the Huddle House manager with Alice Cox in the parking lot and discussed the situation in a polite and civilized manner. Alice Cox and the manager proceeded into Huddle House where she returned the overcharge and both left Huddle House.

9. Alice Cox approached William Bolt, who was finishing their previous conversation about horses. Just as William Bolt and the Huddle House customer were saying goodbye the Huddle House manager interrupts them and tells William Bolt "You are not allowed to say bad things about Huddle House". William Bolt, Alice Cox and the Huddle House customer look at her confused and the Huddle House customer says "ma'am we were just talking horses." She paused and then proceeded to shout at William Bolt and Alice Cox about their 1st amendment. William Bolt told the manager that she is wrong and it is our 1st amendment right to be able to say anything even if it is negative. The manager walked to her car and William Bolt and Alice Cox left the Huddle House restaurant at approximately 5:40 p.m. Eastern Time and returned to their automobile.

10. William Bolt had committed no crime, no traffic violation, and had given no one any reason to summon law enforcement.

## (c). The Traffic Stop and Contract Disclosure

1. Approximately two (2) minutes after leaving Huddle House, at approximately 5:42 p.m. Eastern Time on October 16, 2025, William Bolt was stopped by Defendants John Doe Officers 1-2 of the Harlan City Police Department.

2. The stop occurred on a public roadway in Harlan, Kentucky, within Harlan County.

3. The Defendant Officers approached William Bolt's automobile, which clearly displayed Diplomatic Ambassador At Large license plates on the rear of the automobile.

4. These diplomatic plates are official indicators of William Bolt's status as Ambassador, an internationally protected person. They are analogous to diplomatic license plates issued to foreign embassy personnel and should have immediately signaled to the officers that special jurisdictional considerations apply.

5. CRITICAL KENTUCKY PRECEDENT: Under Kentucky law and precedent established in Ex Parte Knowles, 5 Cal. 301-307 (1855) and Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013), when indicators of special status or jurisdiction are present, officers MUST investigate and establish jurisdiction BEFORE taking any action against an individual.

6. The diplomatic Ambassador At Large plates on William Bolt's automobile were clear visual INDICATORS that required the Defendant Officers to investigate jurisdiction before proceeding. Kentucky precedent is clear: NO ACTION CAN BE TAKEN UNLESS JURISDICTION IS FIRST PROVEN.

7. In addition to the visual indicators (diplomatic plates), William Bolt verbally communicated his status to the Defendant Officers immediately upon their approach. William Bolt clearly, calmly, and respectfully informed the Defendant Officers of the following:
   (a) That he is William Bolt, agent and trustee for WILLIAM MATTHEW BOLT;
   (b) That he is a non-citizen national under 8 U.S.C. § 1101(a)(14);
   (c) That he an Ambassador of the Nation of GNAR;
   (d) That he is Ambassador of the Nation of Pluto Coalition;
   (e) That the Nation of GNAR and Nation of Pluto Coalition are foreign governments at peace with the "United States" per 18 U.S.C. § 11;
   (f) That he is an internationally protected person;
   (g) That he operates WITHOUT the territorial jurisdiction of "the United States" at all times;
   (h) That he is a freeman of the Union traveling under natural right;
   (i) That the automobile is property of the GNARLEY Ministry Trust;
   (j) That he is traveling, not "driving" a "motor vehicle engaged in commerce";
   (k) That his Fee Schedule was $10,000.00 USD per minute for any impedance of which was clearly understood and agreed to.

8. William Bolt offered to provide written documentation supporting his status, including documents establishing his position as Sultan and Ambassador, his non-citizen national status, and the Trust's ownership of the automobile.

9. The Defendant Officers refused to examine William Bolt's documentation and refused to investigate the jurisdictional issues presented by the diplomatic plates and William Bolt's verbal communications.

10. Kentucky precedent requires that when indicators of special status or jurisdiction are present—such as diplomatic plates and verbal communications of ambassador status—officers MUST investigate jurisdiction BEFORE taking action. The Defendant Officers' complete failure to investigate jurisdiction violated clearly established Kentucky law.

11. ENHANCED JURISDICTIONAL ANALYSIS: The burden of proving jurisdiction rests on the party asserting it. Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). Defendant Officers failed to meet this burden and failed to establish prima facie jurisdiction. Under Texas v. Florida, 306 U.S. 398, 424 (1939), "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile." Physical presence alone does not establish domicile or jurisdiction. Plaintiff was traveling through Kentucky, exercising his fundamental right to travel under Kent v. Dulles, 357 U.S. 116, 125 (1958), which recognized that "the right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law." Plaintiff has never established domicile in Kentucky, never conducted business there, and has no "major life interests" connecting him to the State. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 294 (1980) holds that "the Due Process Clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations."

12. During the stop, at approximately 5:45 p.m. Eastern Time, William Bolt verbally and clearly disclosed to all Defendant Officers present that: "Any impediment, detention, or interference with my person, property, or peaceful travel constitutes your agreement to pay TEN THOUSAND DOLLARS ($10,000.00) per minute for such impediment."

13. This contract disclosure was made clearly, audibly, and in the presence of multiple officers who heard and understood the terms.

14. The disclosure of contractual terms at $10,000.00 per minute serves as both notice and formation of a contract: if the officers proceed with detention despite this notice, they have agreed to the terms by their conduct. Under Carpenter v. Longan, 83 U.S. 271 (1872), a party seeking to enforce a contract or regulation against an individual must prove they hold the underlying obligation or instrument establishing consent. Defendant Officers could produce no contract, no

instrument, and no evidence of Plaintiff's consent to Kentucky commercial vehicle jurisdiction.

15. The Defendant Officers heard William Bolt's contract disclosure, understood the terms, and did not dispute or reject the terms at the time of disclosure. Their subsequent conduct in proceeding with detention despite this notice constitutes acceptance of the contract terms by performance.

16. ENHANCED PRIVACY AND IDENTIFICATION ANALYSIS: Under the Privacy Act of 1974, 5 U.S.C. § 552a(e)(3), agencies collecting information from individuals must inform them of:
    (a) the authority (statute or executive order) authorizing the solicitation of information and whether disclosure is mandatory or voluntary;
    (b) the principal purposes for which the information is intended to be used;
    (c) routine uses which may be made of the information; and
    (d) the effects of not providing all or any part of the requested information. Defendant Officers demanded that Plaintiff provide state-issued identification without providing any of these required disclosures, demonstrating they had no lawful statutory authority to compel disclosure. The Police Manual of Arrest, Eighth Edition, § 21, pp. 94-95, states: "The common law does not require a citizen to identify himself or carry identification of any sort. Therefore, while it may be the mark of a good citizen to identify himself when asked to do so, a police officer must not use force to compel someone to identify." Despite this clear standard, Defendant Officers used the threat of arrest and detention to attempt to compel Plaintiff to provide identification he had no duty to carry or produce.

17. Despite William Bolt's clear communications regarding his status, his offer to provide documentation, the presence of diplomatic plates indicating special jurisdictional considerations, and his contract disclosure regarding the cost of unlawful detention, the Defendant Officers proceeded to arrest William Bolt.

18. The Defendant Officers took NO steps to investigate jurisdiction. They made NO inquiry into William Bolt's status as Ambassador or non-citizen national. They made NO contact with any agency or authority to verify or investigate William Bolt's claims. They conducted NO investigation whatsoever before proceeding with arrest.

19. This complete failure to investigate jurisdiction despite clear indicators—diplomatic plates, verbal communications, offered documentation—is a direct violation of Kentucky precedent established in Ex Parte Knowles and Wilson v.

Commonwealth. PRECEDENT HAS ALREADY BEEN SET IN KENTUCKY: NO ACTION CAN BE TAKEN UNLESS JURISDICTION IS FIRST PROVEN.

20.  The Defendant Officers had no warrant for William Bolt's arrest. They had no probable cause to believe William Bolt had committed any crime. They had no lawful basis for detention or arrest.

21.  The stated reason for the stop and arrest, as communicated by the officers, related to alleged violations of motor vehicle codes or registration issues. However, these code enforcement matters require jurisdictional foundation—officers must first establish that the individual is subject to their jurisdiction before enforcing code provisions.

22.  By failing to investigate jurisdiction despite clear indicators, and by proceeding to arrest William Bolt based solely on alleged code violations without establishing jurisdictional authority, the Defendant Officers violated Kentucky precedent, violated William Bolt's Fourth Amendment rights, and acted without lawful authority.

23.  The arrest was therefore unlawful from its inception, void ab initio. Every moment of detention that followed was unlawful trespass against William Bolt's person and property.

24.  By proceeding with arrest after William Bolt's contract disclosure, the Defendant Officers agreed by their conduct to pay $10,000.00 per minute for the unlawful detention. The officers' actions in proceeding despite notice of the contractual terms constitutes acceptance of those terms.

## (d). The Arrest - Unlawful Seizure and Use of Force

1.  Despite the lack of jurisdiction, the lack of probable cause, the lack of a warrant, and William Bolt's clear communications regarding his status and the contract terms, the Defendant Officers proceeded to arrest William Bolt at approximately 5:50 p.m. Eastern Time on October 16, 2025.

2.  The Defendant Officers forcibly removed William Bolt from the Trust's automobile, after asking for William Bolt's license and registration one time.

3.  William Bolt did not resist. William Bolt remained calm and compliant at all times. William Bolt posed no threat to the officers or to anyone else. Even after they threatened to shoot William Bolt while removing William Bolt from the automobile.

4.  Despite William Bolt's complete compliance and lack of resistance, the Defendant Officers used force to effectuate the arrest.

5. The Defendant Officers handcuffed William Bolt tightly, causing pain and restricting circulation.

6. At no time during the arrest did the Defendant Officers:
    (a) Inform William Bolt of the specific charges or reasons for arrest beyond vague references to code violations;
    (b) Conduct any investigation into jurisdiction despite the clear indicators present;
    (c) Examine the documentation William Bolt offered;
    (d) Contact any supervisory personnel or legal advisors regarding the jurisdictional issues;
    (e) Provide William Bolt with Miranda warnings, thereby depriving him of his Fifth Amendment rights.

7. The failure to provide Miranda warnings is significant because it demonstrates the officers' intent to deny William Bolt his constitutional rights from the outset.

8. The Defendant Officers' actions in arresting William Bolt without jurisdiction, without probable cause, without a warrant, and without investigation of the clear jurisdictional indicators, constitute false arrest and unlawful seizure in violation of the Fourth Amendment.

9. William Bolt's wife, Alice Cox, witnessed the arrest and was distressed by the unlawful actions of the Defendant Officers.

10. Alice Cox attempted to communicate with the officers and provide additional information, but the officers ignored her and refused to engage in any meaningful discussion regarding jurisdiction. They didn't understand what was in front of them so they didn't believe and or recognize legal documents.

11. The Defendant Officers transported William Bolt to the Harlan County Detention Center, arriving at approximately 6:30 to 7:00 p.m. Eastern Time on October 16, 2025.

12. During transport, William Bolt reasserted his claims, while being called names and told he was delusional. There were many agreements with the fee schedule acknowledged by the officers, and all the while William Bolt threatening litigation, lawsuits, and claims on contract of the Ten Thousand ($10,000) USD per minute fee schedule that William Bolt continued to promise. William Bolt reiterated his status, his rights, and the contract terms to the transporting officers. He was laughed at, scorned, and subjected to many attempts to shame and coerce him.

13. The officers ignored William Bolt's communications and refused to investigate, and then proceeded to deliver him to the detention center.

14. At approximately 6:45 p.m. Eastern Time, William Bolt arrived at the Harlan County Detention Center located at 6000 KY-38, Evarts, KY, 40828, Harlan, Kentucky.

## (e). Arrival at Harlan County Detention Center - Initial Processing

1. Upon arrival at the Harlan County Detention Center, William Bolt was taken into the custody of Harlan County detention officers, including Defendants "JJ," Jane Doe Jailer 1, and John Doe Jailers 2-5.

2. During the initial intake process, William Bolt again clearly and calmly communicated his status to the detention officers:
(a) Agent and trustee for WILLIAM MATTHEW BOLT;
(b) Non-citizen national under 8 U.S.C. § 1101(a)(14);
(c) Sultan of the Nation of GNAR;
(d) Ambassador of the Nation of GNAR and Nation of Pluto Coalition;
(e) Internationally protected person;
(f) Operating WITHOUT the "United States" at all times.

3. William Bolt informed the detention officers that his arrest was unlawful, that the arresting officers had failed to investigate jurisdiction despite clear indicators, and that he was being detained in violation of Kentucky precedent requiring proof of jurisdiction before action.

4. William Bolt reiterated the contract terms: $10,000.00 per minute for unlawful detention, bringing the total owed at that time to approximately $600,000.00 (60 minutes from arrest to detention center arrival and initial processing).

5. The detention officers responded with hostility and mockery.

6. Defendants became aggressive and confrontational when William Bolt attempted to explain his status and rights.

7. All officers ignored what William Bolt was explaining to them.

8. This hostile reaction by the officers set the tone for the torture that would follow.

9. William Bolt remained nonviolent, despite the officers' hostility. William Bolt raised his voice, but did not make threats in any way other than litigation promises to each officer involved.

10. The detention officers refused to allow William Bolt to contact Alice Cox or any other person outside the facility.

11. The detention officers refused to allow William Bolt access to his documentation or to examine the documentation William Bolt had offered to the arresting officers.

12. During intake, the detention officers began processing William Bolt as a standard pretrial detainee despite the unresolved jurisdictional issues and William Bolt's clear communications regarding his status.

13. The detention officers took William Bolt's personal property, including his wallet, phone, and other items.

14. At approximately 7:00 p.m. Eastern Time on October 16, 2025, the torture began. This torture can be seen on the jail's cameras in the processing section of the jail. The denial of records requests for this footage due to "security concerns" is an oxymoron because you can see that whole area through the waiting room for released prisoners.

## (f). The Chemical Weapon Attack - OC Spray Torture

1. At approximately 7:00 p.m. Eastern Time, Defendant "JJ," assisted by Defendant Jane Doe Jailer 1 and other detention officers, subjected William Bolt to a chemical weapon attack using oleoresin capsicum (OC) spray, commonly known as pepper spray.

2. This attack was entirely unprovoked. William Bolt had not been violent in any way, simply asking the officers repeatedly to investigate and literally pleading with each one. William Bolt had not threatened anyone with anything aside from litigation, and they would all be paying him cash for the abuses.

3. William Bolt had simply attempted to communicate his status and rights in a calm and respectful manner.

4. Defendant "JJ" approached William Bolt making him think he may actually listen to what he was saying and start doing some investigations.

5. There were no physical or verbal warnings of any kind at any point while William Bolt verbally refused to contract with the jail.

6. As "JJ" was standing next to William Bolt with his hand on his shoulder, he asked William Bolt, "Are you going to process?"

7. William Bolt, in disbelief at how much these officers dismissed what he was saying, looked to the other officers standing next to the processing room door.

8. While William Bolt was looking away from officer "JJ" and before William Bolt could properly answer officer "JJ",

9. Officer "JJ" pulled out his OC spray and discharged it directly into William Bolt's face at point-blank range.

10. The footage at the jail shows this and they have denied Plaintiff's records request and have most certainly deleted all evidence William Bolt has demanded.

11. WITHOUT any warning, WITHOUT any justification, WITHOUT William Bolt making any movement or statement that could be construed as threatening or resistive,

12. "JJ" discharged the OC spray canister directly into William Bolt's face at POINT-BLANK RANGE.

13. The official jail documentation falsely states that the OC spray was administered from a distance of "four feet." This is a deliberate lie.

14. "JJ" was inches away—approximately 6 to 12 inches—from William Bolt's face when he discharged the OC spray.

15. The spray was administered at point-blank range, maximizing the severity of the chemical burn and torture.

16. The OC spray entered William Bolt's eyes, nose, mouth, and lungs. The pain was immediate, overwhelming, and incapacitating.

17. OC spray causes intense burning pain, temporary blindness, difficulty breathing, coughing, choking, and panic. The effects are immediate and severe.

18. William Bolt experienced all of these effects to an extreme degree due to the point-blank range and volume of administration. William Bolt's eyes burned with intense pain, much worse than anything Plaintiff had ever experienced. When the OC was deployed it was so close and so hard it literally opened the eyelids of Plaintiff and literally may have caused damage just from the pressure of the OC canister being deployed so close and so direct into his eyes. Visualize a parachute catching wind—that was Plaintiff's eyelids, and the pressure and volume alone felt as if it created lasting damage to both of Plaintiff's eyes.

19. William Bolt could not see. Tears streamed from his eyes involuntarily. His nose ran uncontrollably. His throat constricted. He gasped for air.

20. Before William Bolt could even fully process that he was getting OC'd in the face when he had not been violent,

21. "JJ" and several other officers grabbed William Bolt, slamming him into a restraint chair and then, as forcefully as possible, as the officers choked and coughed uncontrollably themselves from the OC spray contamination in the air, they collectively strapped the Plaintiff extremely tight.

22. They tightened the straps so tight that the leg, wrist, and shoulder restraints were cutting off blood circulation, making his feet, and especially his arms, go numb.

23. Having trained with OC spray and other variations before, William Bolt was able to calm and slow himself down, but only after he realized how close to an actual severe heart attack Plaintiff really was. Plaintiff visualized his wife and focused on Martial Arts training in mindset, and was then able to get his cardiovascular and breathing slowed down. Had Plaintiff not have trained in this manner in recent years, Plaintiff does not believe he would have survived the chemical weapons attack and would have ended up in severe cardiac arrest.

24. Plaintiff could hear the officers outside of the room with the restraint chair, as well as inmates and other detainees, and everyone in the area was either choking or even vomiting. William Bolt was made aware that inmates needed medical attention due to the excessive use of OC spray that caused them severe distress, supporting Plaintiff's claim of excessive amount of OC spray. Consideration of the point-blank administration compounds the claim of "excessive" and serves as an accurate analysis of the amount of OC spray that was discharged.

25. William Bolt remained in the restraint chair with a face full of OC spray for an extended period of time. Eventually, officers came back to attempt to remove the OC spray without removing or allowing Plaintiff to move from the restraint chair. Officers then wrung water out of a towel down Plaintiff's face and did not actually perform much decontamination other than flushing the washed-off OC spray to instead be soaked into the pants and crotch/seat area of Plaintiff, which reacted and created severe burning in his genital region.

26. The attack with OC spray on a non-resistant, compliant detainee who posed no threat constitutes torture under 18 U.S.C. § 2340A, excessive force in violation of the Fourth and Eighth Amendments under Graham v. Connor, 490 U.S. 386 (1989) and Hope v. Pelzer, 536 U.S. 730 (2002), and cruel and unusual punishment per se.

27. At this point, approximately 7:15 p.m. on October 16, 2025, William Bolt had been unlawfully detained for approximately 75 minutes. Under the contract terms disclosed and accepted by the officers' conduct, the amount owed was now approximately $750,000.00, calculated nunc pro tunc from the moment of first unlawful detention.

## (g). The Restraint Chair - Twelve Hours of Torture

1. Directly after being OC sprayed at point-blank range,

2. The officers forcibly grabbed William Bolt and slammed him into a restraint chair located in a cell or holding area.

3. A restraint chair is a device used in jails and prisons to immobilize individuals who are deemed dangerous or uncontrollable. It consists of a chair with straps for the arms, legs, torso, and sometimes head, designed to completely restrict movement.

4. William Bolt posed no danger. William Bolt had not been violent. William Bolt had not resisted. William Bolt had simply asserted his rights and status. There was no legitimate penological justification for placing William Bolt in a restraint chair.

5. Despite William Bolt's lack of resistance or threat, "JJ" and the other officers strapped William Bolt into the restraint chair.

6. The officers strapped William Bolt's arms tightly to the armrests of the chair.

7. The officers strapped William Bolt's legs tightly to the leg rests of the chair.

8. The officers strapped a belt or restraint tightly across William Bolt's torso.

9. The officers placed a restraint across William Bolt's head or neck area, further restricting movement.

10. The restraints were applied extremely tightly. The pressure on William Bolt's arms was so severe that circulation was restricted.

11. William Bolt was left in this restraint chair for approximately TWELVE (12) HOURS, from approximately 7:00 p.m. on October 16, 2025 until approximately 7:00 a.m. on October 17, 2025.

12. During these twelve hours of restraint, William Bolt experienced severe physical and psychological torture, including but not limited to:

## (h). PHYSICAL TORTURE FROM RESTRAINT CHAIR:

1. Circulation Cut Off to Right Arm: The restraint on William Bolt's right arm was so tight that circulation was almost completely cut off. Within the first hour, William Bolt's right arm began to go numb. The numbness progressed to tingling, then to severe pain as nerves were compressed. William Bolt's right arm turned pale and cold from lack of blood flow.

2. Inability to Move: William Bolt could not move his arms, legs, torso, or head. He was completely immobilized. This complete lack of movement for twelve hours

caused severe cramping, muscle pain, and joint pain throughout his body. His muscles screamed in agony from the enforced immobility.

3. Severe Pain Throughout Body: After several hours in the restraint chair, the pain became overwhelming and unbearable. William Bolt's back ached from the enforced posture. His shoulders burned from the strain of the arm restraints. The leg straps were placed directly on a surgical bolt in the titanium rod and pins in Plaintiff's lower right leg from a previous injury, which caused constant excruciating pain along with severe leg cramps.

4. OC Spray Continuing Effects: Throughout the twelve hours in the restraint chair, William Bolt continued to suffer the effects of the OC spray. His eyes continued to badly burn. His face continued to burn. His breathing remained labored. Tears and mucus continued to flow, but William Bolt could not wipe his face due to the restraints. Later on, Plaintiff was told by other detainees that they had to have medical attention. That means that medical attention was rendered to other detainees and officers rather than to the Plaintiff who was directly and violently assaulted in an extreme manner and then placed in a cell, strapped in a chair, not able to move, forced to just sit and burn for a long while.

5. Inability to Wipe Face or Eyes: William Bolt's face was covered in tears, mucus, and saliva from the OC spray effects. He could not wipe his face. He could not clear or open his eyes properly. He was forced to sit in this condition for an extended period of time, the exact duration of which will be revealed in discovery. Upon being poorly decontaminated, Plaintiff was then left to burn and hurt. Officers utilized the chair as a torture device to coerce Plaintiff into processing as an artificial entity, and still did not investigate Plaintiff's continued claims. Plaintiff very much continued to claim and plead with every Officer/Agent there, even while strapped in the chair and burning. Even under the most severe duress they inflicted, Plaintiff continued to plead with them to investigate and perform due diligence to save themselves from a serious lawsuit and potentially their careers. But none took heed and none made any effort to prove jurisdiction. Officers continued to perform on the $10,000.00 per minute contract in clear violation of Kentucky Law and precedent, acting under color of law.

6. Dehumanization - Told to Defecate and Urinate on Himself: At several points during the twelve-hour restraint, William Bolt needed to use the bathroom. He asked the officers for bathroom access. The officers refused because William Bolt continued to refuse to process as a sole proprietorship. The officers told him to "fuck you, piss and shit yourself"—meaning to defecate and urinate on himself while strapped in the chair. William Bolt was told: "Go fuck yourself and shit and piss all over yourself."

7. This directive to defecate and urinate on himself is a form of severe psychological torture and dehumanization. It is designed to humiliate, degrade, and break the spirit of the victim. It treats the victim as less than human, as an animal. This treatment violates fundamental human dignity and constitutes torture under any reasonable definition.

8. William Bolt, through extreme effort and discomfort, was able to hold his bladder and bowels until hours later when he was allowed to get up for a moment. He was then threatened with more chair time and torture if William Bolt didn't process. William Bolt continued to refuse to process unlawfully, and was placed back into the chair for several more hours. The pressure and discomfort from holding his bodily functions added significantly to his physical torture and created intense physical pain and distress.

9. Denial of Water: During the twelve-hour restraint, William Bolt asked for water multiple times. The officers ignored his requests or mocked him. William Bolt became severely dehydrated, which added to his physical distress, made the OC spray effects worse, and created additional medical risks.

10. Psychological Torture: The combination of immobilization, pain, dehumanization, helplessness, and time created severe psychological torture. William Bolt was unable to move, unable to relieve his pain, unable to clean his face, unable to use the bathroom, unable to get water, and unable to communicate effectively with anyone who would help. He was completely at the mercy of his torturers.

11. Fear and Panic: William Bolt experienced episodes of severe panic and fear during the twelve hours. The inability to move combined with breathing difficulties from the OC spray created a sensation of suffocation and entrapment. William Bolt feared he might die in the chair. He feared cardiac arrest. He feared respiratory failure. These fears were reasonable given the severity of the torture being inflicted.

12. Sensory Torture: The restraint chair was in an area where William Bolt could hear other detainees, guards, and activity, but he could not see clearly due to lingering OC spray effects from the point-blank and excessive use. He could not rest his head in any comfortable position due to restraints. This created a disorienting and psychologically torturous sensory experience where he was aware of the world around him but could not interact with it or escape from his torment.

13. No Medical Attention: Despite the obvious severity of William Bolt's distress—the continuing effects of OC spray, the circulation problems in his arm, the pain from prolonged restraint, the reports of near-cardiac symptoms, the severe dehydration—no medical personnel examined William Bolt during the twelve-

hour period. The officers deliberately ignored William Bolt's medical needs in violation of Estelle v. Gamble, 429 U.S. 97 (1976) and Bell v. Wolfish, 441 U.S. 520 (1979).

14. The twelve-hour restraint in the restraint chair, combined with the ongoing effects of the point-blank OC spray attack, constitutes torture under any reasonable definition. It violates 18 U.S.C. § 2340A, the Eighth Amendment's prohibition on cruel and unusual punishment, and constitutes deliberate indifference to serious medical needs.

## (h). The Sexual Torture - OC Spray to Genitals

1. Approximately midway through the twelve-hour restraint period, potentially around 1:00 a.m. on October 17, 2025, the torture escalated to include sexual assault.

2. Defendant John Doe Jailer 1, a male detention officer, approached William Bolt while he was still strapped in the restraint chair.

3. John Doe Jailer 1 was carrying a rag. he used water from a sink in the room to wet the rag.

4. John Doe Jailer 2 then used that water-filled rag to wipe the OC oils off of William Bolt's face.

5. He let the water run down William Bolt's chest and it began to pool and seep through William Bolt's pants and absolutely soaking William Bolt's pants, and onto his genitals.

6. Within seconds of the water contacting his genital area, William Bolt felt intense burning pain in his genitals.

7. The OC spray residue from William Bolt's clothes and still remaining on his face mixed with the water and caused the same severe burning sensation in his genital area that he had experienced on his face.

8. William Bolt's face also started to burn severely once again as she soaked it with water, reactivating the OC spray chemicals.

9. This application of OC spray-contaminated water to William Bolt's genitals constitutes sexual assault and sexual torture. The genitals are an intimate body part. The deliberate or recklessly indifferent application of a chemical weapon to the genitals of a helpless, restrained individual is an act of sexual violence designed to humiliate, degrade, and inflict severe pain in an intimate area.

10. William Bolt cried out in pain from the burning sensation in his genitals and again in his face.

11. A while later, Jane Doe Jailer 1 and other officers present made light of William Bolt's pain, discounting any actual pain, and not making a due diligent effort to correct the situation.

12. The officers' laughter and mocking during this sexual assault demonstrates sadistic intent and deliberate infliction of sexual torture for their amusement.

13. William Bolt was unable to remove his clothing, unable to rinse the contaminated water from his genitals, unable to relieve the burning pain in any way due to being tightly strapped in the restraint chair. He was completely helpless.

14. The burning sensation in William Bolt's genital area continued for hours. The pain was severe, humiliating, and traumatizing.

15. The pain added to the already overwhelming physical and psychological torture of the twelve-hour restraint.

16. This sexual assault with OC spray on William Bolt's genitals while he was helplessly restrained constitutes:
    (a) Sexual assault under Kentucky law;
    (b) Torture under 18 U.S.C. § 2340A (severe pain and suffering inflicted on a helpless victim);
    (c) Cruel and unusual punishment in violation of the Eighth Amendment;
    (d) Deliberate indifference to serious medical needs;
    (e) Assault and battery under Kentucky common law;
    (f) Intentional infliction of emotional distress;
    (g) Violation of fundamental human dignity.

17. The sexual torture of applying OC spray-contaminated water to William Bolt's genitals was in addition to and separate from the facial OC spray attack and the twelve-hour restraint chair torture. Each of these acts independently constitutes torture; together they represent a pattern of deliberate, sadistic, prolonged torture of a helpless pretrial detainee.

### (i). Medical Emergency - Deliberate Indifference

1. Throughout the twelve-hour restraint period, William Bolt experienced symptoms of a medical emergency that the officers deliberately ignored.

2. Near Heart Attack Symptoms: At several points during the restraint, William Bolt experienced severe chest pain, difficulty breathing beyond that caused by the OC spray, rapid heartbeat, and sensations consistent with cardiac distress.

3. William Bolt informed the officers of these symptoms. He stated: "I'm having chest pains. I can't breathe properly. I think I'm having a heart attack. I need medical help immediately."

4. The officers ignored William Bolt's pleas for medical assistance.

5. One officer responded dismissively: "You're fine. Stop being dramatic." Another officer mocked him.

6. William Bolt genuinely feared he was dying. The combination of the OC spray effects, the restraint cutting off circulation to his arm, the stress positions causing severe pain throughout his body, the dehydration, and the severe psychological torture created conditions where cardiac arrest or respiratory failure was a real and imminent possibility.

7. The officers' deliberate indifference to William Bolt's medical emergency constitutes a violation of the Eighth Amendment's prohibition on cruel and unusual punishment and deliberate indifference to serious medical needs.

8. Under Estelle v. Gamble, 429 U.S. 97 (1976), prison and jail officials have a constitutional duty to provide adequate medical care to detainees. Deliberate indifference to a detainee's serious medical needs—where the official knows of and disregards an excessive risk to inmate health or safety—constitutes cruel and unusual punishment in violation of the Eighth Amendment.

9. Under Bell v. Wolfish, 441 U.S. 520 (1979), pretrial detainees who have not been convicted of any crime are entitled to even greater protections than convicted prisoners. The Due Process Clause of the Fourteenth Amendment prohibits punishment of pretrial detainees.

10. William Bolt's symptoms—chest pain, difficulty breathing, fear of imminent death, circulation being cut off, severe dehydration—constituted serious medical needs that the officers deliberately ignored despite having actual knowledge of these conditions.

11. Permanent Injuries: The torture inflicted upon William Bolt has caused lasting injuries including but not limited to:
   (a) Eye Damage: William Bolt continues to experience eye irritation, vision problems, and potential permanent damage from the point-blank OC spray to his face;
   (b) Respiratory Issues: Difficulty breathing and respiratory discomfort persisting after the incident;
   (c) Arm/Circulation Damage: Ongoing numbness, tingling, weakness, and pain in

right arm from the twelve hours of restraint cutting off circulation;

    (d) Genital Injury: Pain, discomfort, and potential scarring in genital area from the OC spray assault;

    (e) Leg Pain: Severe ongoing pain in lower right leg where restraints pressed directly on surgical hardware (titanium rod and pins);

    (f) Psychological Trauma: Severe post-traumatic stress disorder (PTSD), nightmares, flashbacks, anxiety, depression, fear of law enforcement, hypervigilance, inability to sleep, recurring thoughts of the torture;

    (g) Potential Cardiac Damage: William Bolt continues to experience occasional chest pain and heart palpitations that may be related to the stress and physical trauma of the torture.

12. The full extent of permanent damage may not be known for months or years and will require ongoing medical treatment, psychological counseling, and potentially surgical intervention.

## (j). The Forced Strip Search Under Threat of Violence

1. After approximately twelve hours in the restraint chair, at approximately 7:00 a.m. on October 17, 2025, the officers finally removed William Bolt from the restraint chair.

2. William Bolt's body was in severe pain. His right arm was numb and weak from twelve hours of restricted circulation. His legs were cramped. His back ached. He was severely dehydrated. The OC spray effects had diminished but his face, eyes, and genitals still burned.

3. The officers ordered William Bolt to undergo a strip search before he would be allowed to be placed in a regular cell.

4. William Bolt objected to the strip search, explaining again his status, his rights, and that he was being unlawfully detained.

5. William Bolt informed the officers that he was appearing under duress and under threat of violence, and that any cooperation he provided was not voluntary consent but rather compliance with illegal orders under threat of additional torture.

6. William Bolt invoked his Fifth Amendment right against self-incrimination and stated that he would not voluntarily provide any information or cooperation that could be used against him.

7. The officers threatened William Bolt with additional violence if he did not comply. One officer stated: "You can strip yourself or we'll strip you. And if we have to strip you, it won't be nice. You WILL BE OC'd AGAIN OR WORSE!"

8. The threat of being subjected to OC spray again—after the torture he had just endured for twelve hours—was terrifying to William Bolt. The threat was credible given what the officers had already done to him.

9. Additionally, William Bolt was surrounded by approximately five (5) officers who were positioned in an intimidating manner, creating a gang intimidation scenario.

10. Under duress, under threat of additional torture, and in fear for his safety and his life, William Bolt complied with the strip search order.

11. The officers forced William Bolt to remove all of his clothing.

12. The officers forced William Bolt to stand naked while they visually inspected his body.

13. This forced strip search conducted under threat of violence and after twelve hours of torture constitutes sexual assault, unlawful search in violation of the Fourth Amendment, and further psychological torture.

14. The strip search had no legitimate penological purpose. William Bolt was a pretrial detainee who had been in custody for over twelve hours. He had already been searched upon intake. The strip search was conducted purely to further humiliate and degrade William Bolt after the torture, and to demonstrate the officers' complete power and control over his body.

## (k). Detention in "Punishment" Cell

1. After the forced strip search, William Bolt was placed in a cell designated as a "punishment" cell.

2. William Bolt remained in this cell for approximately twelve additional hours, from approximately 7:00 a.m. to approximately 7:00 p.m. on October 17, 2025.

3. During this time, William Bolt was denied adequate food and water. He was given minimal food that was insufficient for his needs, especially given his severe dehydration from the previous twelve hours of torture.

4. William Bolt was denied any medical examination or treatment despite his obvious injuries and medical distress.

5. William Bolt continued to experience severe pain in his right arm, eyes, face, genitals, and throughout his body.

6. The psychological trauma from the torture was overwhelming. William Bolt experienced severe anxiety, fear, flashbacks to the torture, and symptoms of acute stress disorder.

## (l). Gang Intimidation - Multiple Officers Threatening Violence

1. At various points during William Bolt's detention, groups of officers—approximately four (4) to five (5) at a time—would surround William Bolt in an intimidating manner.

2. These officers would make threatening statements, mock William Bolt, and create an atmosphere of fear and intimidation.

3. On at least one occasion, four officers surrounded William Bolt and threatened him with additional violence if he did not "cooperate" by processing as they demanded.

4. This gang intimidation tactic—multiple officers surrounding a single detainee to threaten and intimidate—is a form of psychological torture designed to break the will of the victim.

5. The presence of multiple officers making threats created a reasonable fear in William Bolt that he would be subject to gang violence if he continued to assert his rights.

## (m). October 17, 2025 - Release and Chief Yeary's Personal Threats

1. On October 17, 2025, at approximately 7:00 p.m. Eastern Time, William Bolt was finally released from the Harlan County Detention Center after posting bail.

2. William Bolt had been unlawfully detained for approximately 1,248 minutes (20.8 hours), from approximately 5:50 p.m. October 16 to approximately 3:00 p.m. October 17, 2025, when processing for release began.

3. Upon release, William Bolt was escorted to a release area where he was to be given his personal property and released.

4. Defendant Chief Winston H. "Wink" Yeary Jr., Chief of Police for Harlan City Police Department, was personally present during William Bolt's release.

5. Chief Yeary's personal presence during the release is significant. As the Chief of Police, his presence demonstrates his knowledge of and acquiescence to the torture that had been inflicted upon William Bolt. It also demonstrates that the torture was not the isolated act of rogue officers, but rather was known to and approved by the highest-ranking law enforcement official in the town of Harlan.

6. During the release process, William Bolt was filling out paperwork. An officer or agent ripped the paperwork from William Bolt's hands while Chief Yeary stood by and watched, doing nothing to intervene.

7. Chief Yeary then personally threatened William Bolt. Chief Yeary stated words to the effect of: "If you don't sign what we tell you to sign, we'll call the judge, revoke your bail, and you'll be OC'd again...or worse."

8. This personal threat from Chief Yeary—threatening William Bolt with additional torture (being "OC'd again or worse")—demonstrates:
   (a) Chief Yeary's personal knowledge of the OC spray torture that had been inflicted;
   (b) Chief Yeary's approval and ratification of that torture;
   (c) Chief Yeary's willingness to use threats of torture to coerce compliance;
   (d) That the torture was a policy or custom of the Harlan City Police Department with the knowledge and approval of its Chief.

9. William Bolt's wife, Alice Cox, was present during this exchange and witnessed Chief Yeary's threats.

10. Under duress and in fear of being subjected to additional torture, William Bolt signed the documents that Chief Yeary and the other officers demanded.

11. Chief Yeary's personal threats and his ratification of the torture make him individually liable for all of the torture inflicted upon William Bolt, even if he was not personally present during the actual OC spray attack and restraint chair torture.

## (n). Aftermath - Ongoing Harm

1. William Bolt was finally released from custody at approximately 7:00 p.m. on October 17, 2025.

2. The torture inflicted upon William Bolt has had severe and lasting consequences on his physical health, mental health, and daily life.

3. William Bolt suffers from severe post-traumatic stress disorder (PTSD) as a result of the torture. He experiences nightmares, flashbacks, anxiety, hypervigilance, and difficulty sleeping.

4. William Bolt has an overwhelming fear of law enforcement and avoids any situation where he might encounter police officers.

5. William Bolt has difficulty trusting others and has become socially isolated as a result of the trauma.

6. William Bolt continues to experience physical pain and medical issues from the torture, including ongoing problems with his right arm, eyes, and genitals.

7. William Bolt and Alice Cox have horses that require daily care. The torture and its aftermath severely impacted William Bolt's ability to care for the horses, causing additional stress and harm.

8. William Bolt's relationship with Alice Cox has been strained by the trauma, as he struggles with the psychological aftermath of the torture.

9. William Bolt requires ongoing medical treatment, psychological counseling, and potentially surgical intervention to address the injuries caused by the torture.

## (o). Contract Performance and Damages - $12,480,000 Owed

1. As detailed above, William Bolt clearly disclosed to the Defendant Officers at the time of the traffic stop that any detention or impediment of his person or property would constitute acceptance of a contract requiring payment of $10,000.00 per minute.

2. This disclosure was made clearly, audibly, and in the presence of witnesses including the officers and Alice Cox.

3. The officers heard the disclosure, understood the terms, and proceeded with the detention anyway. Their conduct in proceeding with detention despite clear notice of the contractual terms constitutes acceptance by performance.

4. William Bolt was unlawfully detained for a total of 1,248 minutes (approximately 20.8 hours), from approximately 5:50 p.m. on October 16, 2025 to approximately 3:00 p.m. on October 17, 2025 when release processing began.

5. Calculation of contract damages: 1,248 minutes x $10,000.00 per minute = $12,480,000.00

6. Defendant Officers and their employing entities (City of Harlan and Harlan County) are liable for these contract damages based on their acceptance of the contract terms by performance.

7. This contract claim is in addition to and separate from the constitutional tort claims under 42 U.S.C. § 1983.

8. The contract was formed through William Bolt's clear offer of terms and the Defendants' acceptance by performance (proceeding with detention).

9. The contract was breached when Defendants failed to pay the agreed-upon fee for the detention.

10. William Bolt has performed all conditions precedent to recovery under the contract, including providing clear notice of the terms and enduring the unlawful detention.

11. Defendants have failed to pay the contract damages owed despite demand.

## (p). Pattern and Practice - Monell Liability

1. The City of Harlan and Harlan County are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for maintaining policies, customs, and practices that caused the constitutional violations suffered by William Bolt.

2. Monell liability attaches when a municipality's policy or custom causes a constitutional violation. This includes:
   (a) Official policies or regulations;
   (b) Unofficial customs or practices that are so permanent and well-settled as to constitute law;
   (c) Failure to train, supervise, or discipline when the need for such action is obvious and the failure amounts to deliberate indifference.

3. The City of Harlan and Harlan County maintained the following policies, customs, and practices that caused William Bolt's injuries:
   (a) Failure to train officers on jurisdictional requirements before arrest, particularly when indicators of special status (diplomatic plates, verbal communications of ambassador status) are present;
   (b) Failure to train officers on the constitutional rights of non-citizen nationals under 8 U.S.C. § 1101(a)(14);
   (c) Failure to train officers on internationally protected persons;
   (d) Failure to establish or enforce policies requiring investigation of jurisdiction when clear indicators are present, in violation of Kentucky precedent (Ex Parte Knowles and Wilson v. Commonwealth);
   (e) Policy or custom of using OC spray on non-resistant, compliant detainees;
   (f) Policy or custom of using restraint chairs for extended periods as punishment rather than safety;
   (g) Failure to provide adequate medical care to detainees;
   (h) Failure to train and supervise detention officers on constitutional limitations on use of force;
   (i) Deliberate/indifference to a pattern of excessive force and torture by detention officers;
   (j) Failure to discipline officers who engage in torture and constitutional violations.

4. These policies and customs were the moving force behind the constitutional violations suffered by William Bolt.

5. The policymakers for the City of Harlan and Harlan County (including Chief Yeary and Jailer Burkhart) were deliberately indifferent to the need for adequate policies, training, and supervision.

6. Chief Yeary's personal involvement in threatening William Bolt with additional torture demonstrates that the torture was not an isolated incident but rather a policy or custom of the Harlan City Police Department approved at the highest levels.

### (q). Qualified Immunity Does Not Apply

1. Defendants cannot claim qualified immunity for their actions because the constitutional rights they violated were clearly established at the time of the violations.

2. The right to be free from arrest without probable cause and without jurisdiction has been clearly established for centuries.

3. The right to be free from torture, excessive force, chemical weapon attacks, and twelve hours of restraint has been clearly established under the Fourth and Eighth Amendments and 18 U.S.C. § 2340A.

4. The right to medical care for serious medical needs has been clearly established since Estelle v. Gamble in 1976.

5. No reasonable officer could have believed that OC spraying a non-resistant, compliant detainee at point-blank range, then restraining him for twelve hours, then sexually assaulting him with OC spray to his genitals, all while denying medical care, was lawful.

6. Kentucky precedent (Ex Parte Knowles and Wilson v. Commonwealth) clearly establishes that officers must investigate jurisdiction when indicators of special status are present before taking action. Defendants violated this clearly established law.

7. Moreover, qualified immunity does not apply when officers act with malicious intent or sadistic purpose to cause harm, which is evident here.

### (r). Conspiracy and Coordinated Violations

1. Defendants conspired among themselves to violate William Bolt's constitutional rights.

2. The coordinated nature of the violations—from the initial arrest without jurisdiction investigation, to the transport to the detention center, to the OC spray attack, to the twelve-hour restraint, to the sexual assault, to Chief Yeary's personal threats—

demonstrates an agreement among Defendants to deprive William Bolt of his constitutional rights.

3. This conspiracy violates 42 U.S.C. § 1985 and provides an independent basis for liability.

## (s). Destruction of Evidence and Need for Immediate Preservation

1. It has now been approximately 77 days since October 16, 2025 (as of the anticipated filing date of this Complaint in early January 2026).

2. Critical video evidence of the torture exists on the Harlan County Detention Center's surveillance cameras, including footage of:
   (a) The initial OC spray attack;
   (b) William Bolt being strapped into the restraint chair;
   (c) The twelve hours William Bolt spent in the restraint chair;
   (d) The sexual assault with OC spray-contaminated water;
   (e) The forced strip search;
   (f) The gang intimidation by multiple officers;
   (g) Chief Yeary's presence and threats during release.

3. Standard retention policies for law enforcement video evidence typically require automatic deletion after 30 to 90 days unless the evidence is preserved for investigation or litigation.

4. There is an imminent risk that this critical evidence has already been or will be destroyed through automatic deletion if it has not been properly preserved.

5. Plaintiff demanded preservation of this evidence but Defendants have denied access to the video footage citing "security concerns," which is pretextual given that the waiting room for released prisoners allows visual access to the processing area.

6. The spoliation of evidence—the destruction or alteration of evidence—can support an inference that the destroyed evidence was unfavorable to the party responsible for its destruction. See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003).

7. Emergency relief is necessary to prevent the destruction of this critical video evidence.

## (t). Damages Suffered

1. As a direct and proximate result of Defendants' unlawful actions, William Bolt has suffered and continues to suffer severe damages including:

(i). Physical Injuries:   (a) Eye damage and vision problems from point-blank OC spray;
         (b) Respiratory damage and breathing difficulties;
         (c) Nerve damage, numbness, and weakness in right arm from twelve hours of circulation restriction;
         (d) Pain and injury to genitals from OC spray sexual assault;
         (e) Severe leg pain from restraints on surgical hardware;
         (f) Overall body pain from twelve hours of immobilization;
         (g) Dehydration and its medical consequences;
         (h) Potential cardiac damage from severe stress and actual heart attack symptoms.

3. Psychological Injuries:   (a) Severe post-traumatic stress disorder (PTSD);
         (b) Anxiety and panic attacks;
         (c) Depression;
         (d) Nightmares and flashbacks;
         (e) Fear of law enforcement;
         (f) Hypervigilance;
         (g) Difficulty sleeping;
         (h) Social isolation;
         (i) Difficulty trusting others;
         (j) Strain on personal relationships.

4. Economic Damages:   (a) Medical expenses past, present, and future;
         (b) Psychological counseling expenses;
         (c) Lost income and earning capacity;
         (d) Costs of caring for horses during recovery;
         (e) Other economic losses.

5. Loss of Liberty: William Bolt was unlawfully imprisoned for approximately 1,248 minutes (20.8 hours), during which he was subjected to torture.

6. Pain and Suffering: The physical and psychological pain and suffering William Bolt experienced during and after the torture is immeasurable.

7. Loss of Enjoyment of Life: William Bolt's ability to enjoy daily activities, relationships, and his horses has been severely diminished.

8. Humiliation and Degradation: The sexual assault, forced strip search, and dehumanizing treatment (being told to urinate and defecate on himself) caused severe humiliation.

---

## E. CAUSES OF ACTION

# COUNT I - TORTURE

### (Civil Claim Based on 18 U.S.C. § 2340A)

### (Against All Detention Center Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Title 18 U.S.C. § 2340A defines torture as an act committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control.

3. While § 2340A primarily provides for criminal prosecution, the conduct that violates § 2340A also violates the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and provides a basis for civil liability under 42 U.S.C. § 1983.

4. Defendants, acting under color of state law, subjected William Bolt to torture as defined by § 2340A through the following acts:
   (a) Point-blank OC spray attack at approximately 6 inches distance causing severe physical pain to face, eyes, nose, throat, and respiratory system;
   (b) Twelve (12) continuous hours of restraint in restraint chair with circulation cut off to right arm, complete inability to move any part of body, severe cramping and pain throughout body, restraints placed directly on surgical hardware causing excruciating pain;
   (c) Sexual assault via application of OC spray-contaminated water to genitals causing severe burning pain and humiliation;
   (d) Psychological torture including fear of imminent death, complete helplessness, dehumanization (being told to urinate and defecate on self), sensory torture;
   (e) Deliberate denial of medical care during medical emergency including symptoms of cardiac distress;
   (f) Gang intimidation by multiple officers threatening additional violence;
   (g) Forced strip search under threat of being OC'd again;
   (h) Chief Yeary's personal threats of additional torture ("you'll be OC'd again or worse").

5. Each of these acts individually constitutes torture under § 2340A. Collectively, they represent a systematic, prolonged campaign of torture designed to break William Bolt's will and force him to abandon his rights.

6. The torture was specifically intended to inflict severe physical and mental pain and suffering on William Bolt.

7. The torture was committed by Defendants while acting under color of state law.

8. William Bolt was within the custody and physical control of Defendants during the torture.

9. The torture was not incidental to any lawful sanction. There was no lawful basis for the arrest, detention, or any of the torture inflicted upon William Bolt.

10. Defendants acted with malice, sadistic intent, and deliberate indifference to William Bolt's rights and well-being.

WHEREFORE, Plaintiff demands judgment against Defendants on Count I for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT II - FALSE ARREST

### (Fourth Amendment, 42 U.S.C. § 1983)

### (Against Harlan City Police Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The Fourth Amendment protects individuals from unreasonable seizures, including arrests without probable cause.

3. Defendants John Doe Officers 1-2 (Harlan City Police) arrested William Bolt without probable cause, without a warrant, and without lawful jurisdiction, rendering the arrest void ab initio.

4. KENTUCKY PRECEDENT: Under Kentucky law and precedent established in Ex Parte Knowles, 5 Cal. 301-307 (1855) and Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013), when indicators of special status or jurisdiction are present—such as diplomatic Ambassador At Large plates and verbal communications of ambassador status—officers MUST investigate jurisdiction BEFORE taking action. NO ACTION CAN BE TAKEN UNLESS JURISDICTION IS FIRST PROVEN.

5. William Bolt's automobile displayed Diplomatic Ambassador At Large plates—clear visual indicators of special jurisdictional status.

6. William Bolt verbally communicated his status to the officers, including that he is: a non-citizen national under 8 U.S.C. § 1101(a)(14); Sultan and Ambassador of foreign governments at peace with the United States per 18 U.S.C. § 11; an internationally protected person; operating WITHOUT the "United States" at all times.

7. Despite these clear indicators requiring jurisdictional investigation per Kentucky precedent, the Defendant Officers conducted NO investigation, made NO inquiry, contacted NO supervisory personnel, and examined NONE of the documentation William Bolt offered.

8. The complete failure to investigate jurisdiction when clear indicators are present violated clearly established Kentucky law and rendered the arrest unlawful from its inception, void ab initio.

9. BURDEN OF PROOF: The burden of proving jurisdiction rests on the party asserting it. Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). Defendant Officers failed to establish prima facie jurisdiction or meet this burden.

10. DOMICILE AND JURISDICTION: Under Texas v. Florida, 306 U.S. 398, 424 (1939), "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile." Physical presence alone does not establish domicile or jurisdiction.

11. Plaintiff was traveling through Kentucky exercising his fundamental right to travel under Kent v. Dulles, 357 U.S. 116, 125 (1958), which recognized that "the right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law."

12. Plaintiff has never established domicile in Kentucky, never conducted business there, and has no "major life interests" connecting him to the State.

13. DUE PROCESS LIMITS ON JURISDICTION: World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 294 (1980) holds that "the Due Process Clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations."

14. CONTRACT LAW AND CONSENT: Under Carpenter v. Longan, 83 U.S. 271 (1872), a party seeking to enforce a contract or regulation against an individual must prove they hold the underlying obligation or instrument establishing

consent. Defendant Officers could produce no contract, no instrument, and no evidence of Plaintiff's consent to Kentucky commercial vehicle jurisdiction.

15. PRIVACY ACT: Under the Privacy Act of 1974, 5 U.S.C. § 552a(e)(3), agencies collecting information from individuals must inform them of:
    (a) the authority (statute or executive order) authorizing the solicitation of information and whether disclosure is mandatory or voluntary;
    (b) the principal purposes for which the information is intended to be used;
    (c) routine uses which may be made of the information; and
    (d) the effects of not providing all or any part of the requested information.

16. Defendant Officers demanded that Plaintiff provide state-issued identification without providing any of these required disclosures, demonstrating they had no lawful statutory authority to compel disclosure.

17. POLICE MANUAL STANDARD: The Police Manual of Arrest, Eighth Edition, § 21, pp. 94-95, states: "The common law does not require a citizen to identify himself or carry identification of any sort. Therefore, while it may be the mark of a good citizen to identify himself when asked to do so, a police officer must not use force to compel someone to identify."

18. Despite this clear standard, Defendant Officers used the threat of arrest and detention to attempt to compel Plaintiff to provide identification he had no duty to carry or produce.

19. The arrest violated the Fourth Amendment's prohibition on unreasonable seizures.

20. The arrest was made without probable cause to believe Plaintiff had committed any crime.

21. The arrest was made without a warrant, and without Miranda Rights being given or instructed to William Bolt whatsoever, throughout the duration of the entire detention.

22. The arrest was made without any investigation into the clear jurisdictional issues presented by the diplomatic plates and Plaintiff's verbal communications.

23. William Bolt was non-violent, and posed no threat to the officers or anyone else.

24. The officers threatened to shoot William Bolt during the arrest despite his complete compliance.

25. The false arrest caused William Bolt to suffer loss of liberty, humiliation, fear, and was the proximate cause of all the torture that followed during his unlawful detention.

26. Defendants City of Harlan and Chief Yeary are liable under Monell for policies and customs that caused this false arrest, including failure to train officers on jurisdictional investigation requirements.

WHEREFORE, Plaintiff demands judgment against Defendants on Count II for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT III -

## EXCESSIVE FORCE - CHEMICAL WEAPON TORTURE

### (Fourth Amendment, 42 U.S.C. § 1983)

### (Against All Detention Center Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The Fourth Amendment prohibits excessive force during arrest and detention.

3. Under Graham v. Connor, 490 U.S. 386 (1989), the reasonableness of force must be judged from the perspective of a reasonable officer on the scene, considering:
   (a) the severity of the crime;
   (b) whether the suspect poses an immediate threat;
   (c) whether the suspect is actively resisting or attempting to evade arrest.

4. William Bolt:     (a) was arrested for alleged minor code violations;
   (b) posed no threat whatsoever to officers or anyone else;
   (c) was completely non-violent.

5. Despite these factors, Defendants subjected William Bolt to extreme excessive force including:     (a) Point-blank OC spray attack (6-12 inches from face) causing severe chemical burns;
   (b) Twelve continuous hours of restraint in restraint chair;
   (c) Application of OC spray to genitals;
   (d) Threats of shooting during arrest;
   (e) Gang intimidation.

6. Under Hope v. Pelzer, 536 U.S. 730 (2002), prolonged restraint that causes severe pain constitutes excessive force and violates clearly established law.

7. The use of chemical weapons on a restrained, non-resistant detainee is excessive force per se.

8. No reasonable officer could have believed that this level of force was justified against a non-threatening pretrial detainee.

9. Defendants acted with malice and sadistic intent to cause harm, not in good faith effort to maintain order.

WHEREFORE, Plaintiff demands judgment against Defendants on Count III for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT IV -

# CRUEL AND UNUSUAL PUNISHMENT

### (Eighth Amendment, 42 U.S.C. § 1983)

### (Against All Detention Center Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The Eighth Amendment prohibits cruel and unusual punishment.

3. Pretrial detainees like William Bolt are protected by the Due Process Clause of the Fourteenth Amendment, which affords at least as much protection as the Eighth Amendment.

4. The torture inflicted upon William Bolt constitutes cruel and unusual punishment including:
   (a) Point-blank chemical weapon attack;
   (b) Twelve hours continuous restraint causing severe pain;
   (c) Sexual assault with OC spray;
   (d) Being told to defecate and urinate on self;
   (e) Denial of bathroom access;
   (f) Denial of water and food;
   (g) Forced strip search under threat of additional torture.

5. This treatment was not imposed as part of any sentence but rather was punishment imposed on a pretrial detainee who had not been convicted of any crime.

6. The treatment violates contemporary standards of decency and shocks the conscience.

WHEREFORE, Plaintiff demands judgment against Defendants on Count IV for compensatory damages, punitive damages, and all other relief set forth below.

# COUNT V - DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

### (Eighth Amendment, 42 U.S.C. § 1983)

### (Against All Detention Center Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Under Estelle v. Gamble, 429 U.S. 97 (1976), deliberate indifference to a detainee's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment.

3. Pretrial detainees are entitled to at least as much protection as convicted prisoners under Bell v. Wolfish, 441 U.S. 520 (1979).

5. William Bolt suffered serious medical needs including:
   (a) Severe chest pain and cardiac distress symptoms;
   (b) Difficulty breathing from OC spray;
   (c) Circulation cut off to right arm for twelve hours;
   (d) Dehydration;
   (e) Chemical burns to eyes, face, and genitals;
   (f) Severe pain from restraints on surgical hardware.

6. William Bolt informed Defendants of these medical emergencies and repeatedly requested medical assistance.

7. Defendants deliberately ignored William Bolt's medical needs, mocked him when he complained of symptoms, and refused to provide any medical examination or treatment during the twelve-hour torture period.

8. Defendants knew of and disregarded an excessive risk to William Bolt's health and safety.

9. The deliberate indifference was not an isolated incident but rather part of a pattern and practice at the Harlan County Detention Center.

WHEREFORE, Plaintiff demands judgment against Defendants on Count V for compensatory damages, punitive damages, and all other relief set forth below.

# COUNT VI - FAILURE TO PROVIDE MIRANDA WARNINGS

### (Fifth Amendment, 42 U.S.C. § 1983)

### (Against Harlan City Police Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The Fifth Amendment protects against self-incrimination and requires that individuals in custody be informed of their rights before interrogation.

3. William Bolt was in custody from the moment of arrest.

4. Defendants never provided William Bolt with Miranda warnings.

5. The failure to provide Miranda warnings demonstrates Defendants' intent to deny William Bolt his constitutional rights from the outset of the unlawful detention.

WHEREFORE, Plaintiff demands judgment against Defendants on Count VI for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT VII

# FIRST AMENDMENT RETALIATION

### (42 U.S.C. § 1983)

### (Against All Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The First Amendment protects the right to free speech, including the right to assert one's legal status and rights to government officials.

3. William Bolt engaged in protected speech by:
   (a) Asserting his status as non-citizen national and Ambassador;
   (b) Informing officers of jurisdictional issues;
   (c) Refusing to consent to unlawful processing;
   (d) Asserting his constitutional rights.

4. Defendants retaliated against William Bolt for this protected speech by subjecting him to arrest, torture, and continued detention.

5. The torture escalated specifically because William Bolt refused to abandon his rights and continued to assert his status.

6. But for William Bolt's protected speech, Defendants would not have subjected him to the severe torture described herein.

WHEREFORE, Plaintiff demands judgment against Defendants on Count VII for compensatory damages, punitive damages, and all other relief set forth below.

# COUNT VIII - DUE PROCESS VIOLATIONS

### (Fourteenth Amendment, 42 U.S.C. § 1983)

### (Against All Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The Fourteenth Amendment Due Process Clause prohibits states from depriving any person of life, liberty, or property without due process of law.

3. William Bolt was deprived of liberty without any due process. Defendants:
   - (a) Arrested him without probable cause or jurisdiction;
   - (b) Detained him without a hearing;
   - (c) Tortured him without any procedural protections;
   - (d) Forced him to sign documents under threat of additional torture.

4. The torture inflicted upon William Bolt shocks the conscience and violates substantive due process.

5. Pretrial detainees cannot be punished, yet William Bolt was subjected to severe punishment including torture.

WHEREFORE, Plaintiff demands judgment against Defendants on Count VIII for compensatory damages, punitive damages, and all other relief set forth below.

# COUNT IX -

# EQUAL PROTECTION - DISCRIMINATION BASED ON NON-CITIZEN NATIONAL STATUS

### (Fourteenth Amendment, 42 U.S.C. § 1983)

**(Against All Defendants)**

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. The Fourteenth Amendment guarantees equal protection of the laws.

3. Under Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886), the Fourteenth Amendment protections extend to "all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality."

4. William Bolt was treated differently and subjected to torture because of his status as a non-citizen national and Ambassador of foreign governments.

5. Defendants' hostility toward William Bolt's assertions of his non-citizen national status motivated the arrest and torture.

6. Similarly situated individuals who identify as state citizens would not have been subjected to this treatment.

WHEREFORE, Plaintiff demands judgment against Defendants on Count IX for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT X

# CONSPIRACY TO VIOLATE CIVIL RIGHTS

### (42 U.S.C. §§ 1983 and 1985)

**(Against All Defendants)**

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Defendants conspired among themselves to violate William Bolt's constitutional rights.

3. The conspiracy is evidenced by the coordinated nature of the violations from arrest through release.

4. Defendants reached an agreement to deprive William Bolt of his rights and acted in furtherance of that agreement.

5. William Bolt suffered injury as a direct result of the conspiracy.

WHEREFORE, Plaintiff demands judgment against Defendants on Count X for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XI - FAILURE TO INTERVENE

### (42 U.S.C. § 1983)

### (Against All Defendant Officers)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Officers have a duty to intervene to prevent other officers from violating constitutional rights.

3. Multiple officers were present during the torture of William Bolt and had reasonable opportunity to intervene.

4. These officers failed to intervene to stop the OC spray attack, the restraint chair torture, the sexual assault, or the denial of medical care.

5. The failure to intervene makes these officers individually liable for the constitutional violations.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XI for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XII -

# MONELL MUNICIPAL LIABILITY - CITY OF HARLAN

### (42 U.S.C. § 1983)

### (Against City of Harlan and Chief Yeary)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), municipalities are liable when their policies or customs cause constitutional violations.

3. The City of Harlan maintained the following policies, customs, and practices that caused William Bolt's injuries:
   (a) Failure to train officers on jurisdictional requirements before arrest,

particularly when indicators of special status are present;

(b) Failure to train officers on Ex Parte Knowles and Wilson v. Commonwealth requiring investigation of jurisdiction;

(c) Failure to train officers on rights of non-citizen nationals and internationally protected persons;

(d) Policy or custom of arresting based solely on code violations without establishing jurisdiction;

(e) Failure to discipline officers who violate constitutional rights;

(f) Pattern and practice of excessive force.

4. Chief Yeary, as final policymaker for the City of Harlan Police Department, was deliberately indifferent to the need for these policies and training.

5. Chief Yeary's personal participation in threatening William Bolt with additional torture demonstrates that the constitutional violations were approved at the highest level and constitute official policy.

6. These policies and customs were the moving force behind the false arrest and all subsequent torture.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XII for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XIII -

# MONELL MUNICIPAL LIABILITY - HARLAN COUNTY

### (42 U.S.C. § 1983)

### (Against Harlan County and Jailer Burkhart)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Harlan County maintained the following policies, customs, and practices that caused William Bolt's injuries:

(a) Using OC spray on restrained, non-resistant detainees;

(b) Using restraint chairs for twelve-hour periods as punishment;

(c) Applying OC spray to detainees' genitals;

(d) Denying medical care to detainees in medical emergencies;

(e) Failure to train detention officers on constitutional limits on use of force;

(f) Failure to supervise detention officers;

(g) Deliberate indifference to pattern of torture and abuse;

(h) Failure to discipline officers who torture detainees.

3. Jailer Burkhart, as final policymaker for the detention center, was deliberately indifferent to the need for proper policies, training, and supervision.

4. The torture of William Bolt was not an isolated incident but rather reflects systemic problems at the Harlan County Detention Center.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XIII for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XIV - DEFAMATION

### (Kentucky Common Law)

### (Against Huddle House Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Huddle House staff made false statements to police about William Bolt that precipitated his arrest.

3. These false statements damaged William Bolt.

4. The statements were made with malice or reckless disregard for the truth.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XIV for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XV - MALICIOUS PROSECUTION

### (Kentucky Common Law)

### (Against All Law Enforcement Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Defendants initiated criminal proceedings against William Bolt without probable cause.

3. The proceedings were motivated by malice and improper purpose.

4. The proceedings terminated in William Bolt's favor or will terminate in his favor.

5. William Bolt suffered damages as a result.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XV for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XVI -

# INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Kentucky Common Law)

### (Against All Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Defendants' conduct was extreme and outrageous, exceeding all bounds of decency tolerated in civilized society.

3. The torture—including point-blank OC spray, twelve hours of restraint, sexual assault with OC spray to genitals, being told to urinate and defecate on self, denial of medical care, gang intimidation, and Chief Yeary's threats—was intentional and malicious.

4. Defendants intended to cause severe emotional distress or acted with reckless disregard for the certainty that severe emotional distress would result.

5. As a direct result of Defendants' conduct, William Bolt has suffered and continues to suffer severe emotional distress including PTSD, anxiety, depression, nightmares, flashbacks, and fear.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XVI for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XVII

# ASSAULT AND BATTERY

### (Kentucky Common Law)

### (Against All Detention Center Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Defendants committed assault by placing William Bolt in reasonable apprehension of imminent harmful or offensive contact through threats and menacing conduct.

3. Defendants committed battery by intentionally causing harmful and offensive contact with William Bolt's person through:
   (a) Point-blank OC spray attack;
   (b) Forcibly strapping him in restraint chair;
   (c) Applying OC spray-contaminated water to his genitals;
   (d) Forced strip search.

4. These contacts were intentional, harmful, offensive, and without William Bolt's consent.

5. William Bolt suffered physical injuries and damages as a result.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XVII for compensatory damages, punitive damages, and all other relief set forth below.

---

# COUNT XVIII - FALSE IMPRISONMENT

### (Kentucky Common Law)

### (Against All Defendants)

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Defendants intentionally confined William Bolt against his will.

3. The confinement was without lawful authority, privilege, or consent.

4. William Bolt was aware of the confinement.

5. The confinement lasted approximately 20.8 hours.

6. William Bolt suffered damages as a result of the false imprisonment.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XVIII for compensatory damages, punitive damages, and all other relief set forth below.

# COUNT XIX - NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION

**(Kentucky Common Law)**

**(Against City of Harlan, Harlan County, Chief Yeary, and Jailer Burkhart)**

1. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

2. Defendants City of Harlan and Chief Yeary had a duty to exercise reasonable care in hiring, training, supervising, and retaining police officers.

3. Defendants Harlan County and Jailer Burkhart had a duty to exercise reasonable care in hiring, training, supervising, and retaining detention officers.

4. Defendants breached these duties by:
   (a) Failing to adequately screen and train officers;
   (b) Failing to establish adequate policies and procedures;
   (c) Failing to supervise officers;
   (d) Retaining officers with known propensities for excessive force and torture;
   (e) Failing to discipline officers who engage in constitutional violations.

5. These breaches were the proximate cause of William Bolt's injuries.

6. William Bolt's injuries were a foreseeable result of Defendants' negligence.

WHEREFORE, Plaintiff demands judgment against Defendants on Count XIX for compensatory damages, punitive damages, and all other relief set forth below.

## F. DEMAND FOR JURY TRIAL

1. Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution.

## G. PRAYER FOR RELIEF

WHEREFORE, Plaintiff William Bolt respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

### (a). COMPENSATORY DAMAGES

1. Award compensatory damages in the amount of ONE HUNDRED AND TWO MILLION U.S. DOLLARS ($102,000,000.00) for:

> (A) Physical injuries and pain and suffering;
> (B) Psychological trauma and emotional distress;
> (C) Medical expenses past, present, and future;
> (D) Loss of enjoyment of life;
> (E) Economic damages;
> (F) Loss of liberty;
> (G) Harm to reputation;
> (H) All other compensatory damages proven at trial.

### (b). CONTRACT DAMAGES

1. Award contract damages in the amount of TWELVE MILLION FOUR HUNDRED AND EIGHTY THOUSAND U.S. DOLLARS ($12,480,000.00 USD) for breach of contract based on 1,248 minutes of unlawful detention at the agreed rate of TEN THOUSAND U.S. DOLLARS ($10,000.00 USD) per minute, calculated nunc pro tunc from the moment of first unlawful detention.

### (c). PUNITIVE DAMAGES

1. Award punitive damages in an amount sufficient to punish Defendants for their malicious, wanton, willful, reckless, and sadistic conduct, and to deter Defendants and others from engaging in similar conduct in the future.

### (d). DECLARATORY RELIEF

1. Declare that Defendants violated William Bolt's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

2. Declare that Defendants violated 18 U.S.C. § 2340A by subjecting William Bolt to torture.

3. Declare that the arrest was void ab initio for lack of jurisdiction.

4. Declare that Defendants' policies and customs violate the Constitution.

## (e).  INJUNCTIVE RELIEF

1.  Enjoin Defendants from continuing the unconstitutional policies and practices described herein.

2.  Order Defendants to implement adequate training on jurisdictional investigation requirements, particularly Ex Parte Knowles and Wilson v. Commonwealth.

3.  Order Defendants to implement policies prohibiting use of OC spray on non-resistant detainees.

4.  Order Defendants to implement policies prohibiting use of restraint chairs for extended periods.

5.  Order Defendants to implement adequate medical care protocols for detainees.

## (f). ATTORNEYS' FEES AND COSTS

1.  Award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## (g).  PRE-JUDGMENT AND POST-JUDGMENT INTEREST

1.  Award pre-judgment and post-judgment interest at the maximum rate allowed by law.

## (h).  PRESERVATION OF EVIDENCE

1.  Order immediate preservation of all video footage, audio recordings, medical records, incident reports, and other evidence related to this case.

2.  Order production of all such evidence in emergency urgency.

## (i).  OTHER RELIEF

1.  Grant such other and further relief as this Court deems just and proper.

---

**RESPECTFULLY FILED**

Dated this _02_ day of _January_, 2026.

_William Bolt, agent / WILLIAM MATTHEW BOLT, principle_

William Bolt, agent and trustee / Attorney-in-fact for WILLIAM MATTHEW BOLT /
Pro Se, In Propria Persona, Sui Juris / Special Appearance for Limited Purpose / Freeman
of the Union / WITHOUT the "United States" at all times / Sultan and Ambassador of the
Nation of GNAR / Ambassador of the Nation of Pluto Coalition / Foreign governments
per 18 U.S.C. § 11 / At peace with the corporation "United States" / Non-citizen national,
8 U.S.C. § 1101(a)(14) / Internationally protected person

All rights reserved pursuant to UCC 1-308

CONTACT INFORMATION:

William Bolt

c/o Carol Bolt

5264 S. Liberty Pike

Liberty, IN 47353

Phone: (970) 409-8417

**Document Prepared by: William Bolt, agent**

**As per federal rules, all social security numbers have been purposely omitted or not applicable to be included or redacted.**

**VERIFICATION**

I, William Bolt, agent and trustee, declare that I have read the foregoing Complaint, that I know the contents thereof, and that the same is true and correct of my own personal knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the unincorporated united states of America that the foregoing is true and correct.

Executed this 02 day of January , 2025, at Liberty, Indiana.

William Bolt, agent / WILLIAM MATTHEW BOLT

William Bolt, agent and trustee

**CERTIFICATE OF SERVICE**

I hereby certify that on this 02 day of January , 2026, I caused a true and correct copy of the foregoing COMPLAINT to be served upon all Defendants by [METHOD OF SERVICE] at [addresses to be determined].

William Bolt, agent / WILLIAM MATTHEW BOLT, principle

William Bolt, agent and trustee

All rights reserved pursuant to UCC 1-308

Harlan, Kentucky, Federal Complaint ( Bolt v. Commonwealth (KY))          Page **55** of 56

**END OF FEDERAL COMPLAINT**

---