Eastern District of Kentucky
FILED

JAN - 2 2026

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

William Bolt, agent;
WILLIAM MATTHEW BOLT, principal;

Case No.: 6:26-cv-54

Plaintiff,

v.

CITY OF HARLAN, KENTUCKY;
WINSTON H. "WINK" YEARY JR., individually and in his official capacity as City of Harlan, Kentucky, Chief of Police;
JOHN DOE OFFICERS 1-2, individually and in their official capacities as City of Harlan, Kentucky, Police Officers;
HARLAN COUNTY, KENTUCKY;
BJ BURKHART, individually and in his official capacity as Harlan County Jailer;
JOHN DOE JAILER "JJ", individually and in his official capacity;
JANE DOE JAILER 1, individually and in her official capacity;
JOHN DOE JAILERS 2-6, individually and in their official capacities;
JOHN DOE SHERIFF DEPUTY, individually and in his official capacity
HUDDLE HOUSE, INC.;
JANE DOE HUDDLE HOUSE MANAGER;
COLES AUTOBODY AND TOWING;
JOHN DOE DEFENDANTS 7-12,

**Defendants.**

## MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR EXPEDITED DISCOVERY AND PRESERVATION OF EVIDENCE

## TABLE OF CONTENTS

I. INTRODUCTION

II. STATEMENT OF FACTS

A. The Unlawful Arrest Without Jurisdiction

B. The Torture at Harlan County Detention Center

1. Point-Blank Chemical Weapon Attack

2. Twelve Hours of Restraint Chair Torture

3. Sexual Assault with OC Spray

4. Denial of Medical Care During Medical Emergency

5. Gang Intimidation and Threats

6. Chief Yeary's Personal Threats During Release

C. Defendants' Refusal to Preserve Evidence

III. LEGAL STANDARD

IV. ARGUMENT

A. Good Cause Exists for Immediate Expedited Discovery

1. The Evidence is Necessary to Adequately Prepare and Prove Plaintiff's Case

2. The Evidence is Not Otherwise Available

3. There is Imminent Danger Evidence Will Be Lost or Destroyed

4. The Evidence Sought is Critical and Irreplaceable

5. Evidence is at Imminent Risk of Destruction

a. Automatic Deletion Policies

b. Manual Destruction Risk

c. The "Security Concerns" Pretext

6. Defendants Have Demonstrated Willingness to Falsify Records and Conceal Evidence

7. The Privacy Act Violations Support Immediate Discovery

8. Financial Discovery is Necessary to Establish RICO Pattern and Motive

i. Financial Motive for Unconstitutional Arrests

ii. UCC § 9-210 Accounting Rights

iii. IRS Whistleblower Foundation

iv. Standard Discovery Timeline Would Result in Irreparable Prejudice

v. Public Policy Favors Preservation of Evidence of Torture and Constitutional Violations

V. CONCLUSION

# I. INTRODUCTION

This case involves systematic torture of a pretrial detainee in violation of 18 U.S.C. § 2340A, the Fourth Amendment, Fifth Amendment, Eighth Amendment, and Fourteenth Amendment to the United States Constitution. On October 16-17, 2025, Defendants subjected Plaintiff William Bolt to twenty (20) hours of torture including point-blank chemical weapon assault, twelve hours of restraint chair torture with circulation cut off, sexual assault with oleoresin capsicum (OC) spray applied to genitals, denial of medical care during a medical emergency, gang intimidation, and threats of additional torture by the Chief of Police himself.

The entire sequence of events was captured on body-worn cameras, jail surveillance cameras, and dispatch audio recordings. This evidence is critical, irreplaceable, and at imminent risk of destruction. Eighty (80) days have elapsed since the incident. Standard retention periods for law enforcement video and audio are 30-90 days. Despite Plaintiff's multiple written demands for preservation, Defendants have refused to preserve and produce the evidence.

This Court's immediate intervention is necessary to prevent spoliation of evidence that will conclusively prove Defendants tortured Plaintiff in violation of federal criminal statutes and clearly established constitutional law. Plaintiff respectfully requests that this Court grant the pending Emergency Motion and order Defendants to preserve and produce all evidence within the abbreviated timelines requested.

# II. STATEMENT OF FACTS

## A. The Unlawful Arrest Without Jurisdiction

On October 16, 2025, at approximately 6:00 p.m. Eastern Time, Defendant Officers of the Harlan City Police Department stopped Plaintiff's automobile in Harlan, Kentucky. The automobile, owned by the GNARLEY Ministry Trust, displayed Diplomatic Ambassador At Large license plates clearly visible on the rear of the vehicle.

Upon approach by Defendant Officers, Plaintiff immediately communicated his status as Ambassador of the Nation of GNAR and Nation of Pluto Coalition (foreign governments at peace with the "United States" per 18 U.S.C. § 11), non-citizen national under 8 U.S.C. § 1101(a)(14), and internationally protected person. Plaintiff informed the officers that he operates WITHOUT the territorial jurisdiction of "the United States" at all times. Plaintiff offered to provide written documentation supporting his status.

Under Kentucky precedent established in Ex Parte Knowles, 5 Cal. 301-307 (1855) and reaffirmed in Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013), when indicators of special status or jurisdiction are present—such as diplomatic plates and verbal communications of ambassador status—officers MUST investigate jurisdiction BEFORE

taking any action. NO ACTION CAN BE TAKEN UNLESS JURISDICTION IS FIRST PROVEN.

The Defendant Officers refused to examine Plaintiff's documentation. They conducted NO investigation of jurisdiction whatsoever. They made NO inquiry into Plaintiff's status. They took NO steps to verify Plaintiff's claims. Despite the clear indicators requiring jurisdictional investigation under Kentucky precedent, the officers proceeded to arrest Plaintiff without jurisdiction, without probable cause, and without a warrant.

## B. The Torture at Harlan County Detention Center

After unlawful arrest, Defendant Officers transported Plaintiff to the Harlan County Detention Center, arriving at approximately 7:00 p.m. Eastern Time. What followed was systematic torture spanning twenty (20) hours:

### 1. Point-Blank Chemical Weapon Attack

At approximately 7:00 p.m. on October 16, 2025, Defendant "JJ," a detention officer, approached Plaintiff while Plaintiff stood facing a wall, compliant and non-resistant. Without warning, without justification, and while Plaintiff was making no threatening movement or statement, "JJ" discharged OC spray directly into Plaintiff's face at POINT-BLANK RANGE.

The official jail documentation falsely states that OC spray was administered from a distance of "four feet." This is a deliberate lie. "JJ" was inches away from Plaintiff's face when he discharged the spray. The spray was administered at point-blank range, maximizing the severity of the chemical burn and torture. This false documentation demonstrates Defendants' knowledge that the close-range administration was improper and their willingness to falsify records to conceal misconduct.

The OC spray entered Plaintiff's eyes, nose, mouth, and lungs. The pain was immediate, overwhelming, and incapacitating. The pressure and volume of the point-blank discharge literally forced open Plaintiff's eyelids, potentially causing permanent eye damage. The excessive amount of OC spray permeated the entire processing area, causing other detainees and even officers to choke and require medical attention. Plaintiff, the direct victim of the attack, received no medical attention.

### 2. Twelve Hours of Restraint Chair Torture

Immediately after the chemical weapon attack, officers forcibly grabbed Plaintiff and slammed him into a restraint chair. Officers strapped Plaintiff's arms, legs, torso, and head to the chair with extreme tightness. The restraints on Plaintiff's arms were so tight that circulation was almost completely cut off. Within the first hour, Plaintiff's arm began to go numb, very badly, and the pain Plaintiff endured for hours of intense tight straps

especially on arms. Plaintiff hurt so bad he began to panic as the pain was near unbearable. The numbness progressed to tingling, then on to much more severe pain as nerves were compressed. Plaintiff struggled for hours, in agony. Officers still refusing to investigate continued claims of legal status by Plaintiff, the entire time of detainment, as well as the contract fee schedule, in detail.

Plaintiff remained in the restraint chair for approximately TWELVE (12) HOURS, from approximately 7:00 p.m. on October 16, 2025 until approximately 7:00 a.m. on October 17, 2025. During these twelve hours:
    a. Plaintiff could not move any part of his body;
    b. Plaintiff experienced severe cramping, muscle pain, and joint pain throughout his body;
    c. Plaintiff continued to suffer the effects of OC spray—burning eyes, burning face, difficulty breathing, tears and mucus flowing—but could not wipe his face due to restraints;
    d. Plaintiff asked for bathroom access and was told to "piss and shit yourself"—a form of severe psychological torture and dehumanization;
    e. Plaintiff asked for water multiple times and was ignored or mocked;
    f. Plaintiff experienced chest pain, difficulty breathing, and fear of dying, but received no medical attention;
    g. Officers mocked and laughed at Plaintiff's distress.

## 3. Sexual Assault with OC Spray

Approximately midway through the twelve-hour restraint period, around 1:00 a.m. on October 17, 2025, Defendant Jane Doe Jailer 1 approached Plaintiff with a water-soaked rag. She wiped the OC spray from Plaintiff's face, allowing contaminated water to run down Plaintiff's chest and pool in his pants and genital area. Within seconds, Plaintiff felt intense burning pain in his genitals from the OC spray residue mixed with water.

This application of OC spray to Plaintiff's genitals while he was helplessly restrained constitutes sexual assault and sexual torture. The deliberate application of a chemical weapon to the genitals of a helpless individual is an act of sexual violence designed to humiliate, degrade, and inflict severe pain in an intimate area. Officers laughed and mocked Plaintiff when Plaintiff voiced this sexual assault. Plaintiff was unable to remove clothing, unable to rinse the contaminated water, unable to relieve the burning pain in any way.

## 4. Denial of Medical Care During Medical Emergency

Throughout the restraint period, Plaintiff experienced symptoms of medical emergency including severe chest pain, severe difficulty breathing beyond that caused by OC spray, rapid heartbeat, and sensations very consistent with cardiac distress. Plaintiff informed

officers of these symptoms. Plaintiff stated: "I'm having chest pains. I can't breathe. I think I'm having a heart attack. I need medical help."

Officers ignored Plaintiff's pleas. No medical personnel examined Plaintiff during or after the twenty-hour torture despite obvious need for medical evaluation and treatment. This deliberate indifference to serious medical needs violates Estelle v. Gamble, 429 U.S. 97 (1976), and constitutes cruel and unusual punishment.

### 5. Gang Intimidation and Threats

At some point during Plaintiff's detention, four (4) detention officers (Defendants John Doe Jailers 2-5) appeared at Plaintiff's cell in an intimidating formation. The officers surrounded Plaintiff and threatened him with additional violence if he continued to assert his rights and refuse to "process" as a corporate entity. This gang intimidation tactic was designed to suppress Plaintiff's speech and retaliate for his assertion of constitutional rights.

### 6. Chief Yeary's Personal Threats During Release

On October 17, 2025, at approximately 6:00 p.m., Plaintiff was released after posting bail. Chief of Police Winston H. "Wink" Yeary Jr. was personally present during Plaintiff's release. The Chief of Police does not typically personally appear for the release of ordinary detainees. Chief Yeary's presence demonstrates his personal awareness of Plaintiff's case and his participation in the pattern of retaliation and intimidation.

During release, an officer physically ripped paperwork from Plaintiff's hands when Plaintiff attempted to complete his signature reserving his rights. Chief Yeary supervised this assault and threatened Plaintiff, stating: "If you don't leave right now, we will call the judge and revoke your bail right now." Officers additionally threatened that Plaintiff would "be OC'd again...or worse" if he did not comply.

Chief Yeary's personal threats are extraordinarily significant. The phrase "OC'd again" is a confession that Chief Yeary was aware Plaintiff had been subjected to OC spray torture. The phrase "or worse" threatened violence exceeding the chemical weapon attack, twelve-hour restraint, and sexual assault Plaintiff had already endured. This was a direct threat of potentially deadly force made by the highest-ranking police official in Harlan.

### C. Defendants' Refusal to Preserve Evidence

Within just a couple of his release, Plaintiff made certified and documented written demands to Defendants for preservation and production of evidence. Plaintiff submitted public records requests under Kentucky open records law. Defendants refused, claiming that Plaintiff does not qualify under Kentucky statutes because he is not a Kentucky resident and does not have a business presence in Kentucky.

Harlan County Detention Center specifically responded claiming "security concerns" as justification for denial of surveillance footage. This justification is pretextual. Plaintiff's wife, Alice Cox, stood in the public waiting room during Plaintiff's release and could view a very substantial portion approximately sixty (60) percent of the entire area through the glass door of Plaintiff's entire detention, which only consisted of the strip cell, intake area, and the cell at the end of the small hallway to the right as entering through door where Alice Cox stood and listened and watched as Plaintiff was released, and also witnessed the paperwork being physically ripped out from under Plaintiff's hand as he signed the release documents, "Without Prejudice, and in his legal format that Plaintiff signs consistently. If the area is visible to the general public in the waiting room, there are no legitimate security concerns preventing production of surveillance footage to Plaintiff, as Plaintiff was not anywhere else in the facility aside from the strip search cell where several assaults took place, the holding punishment cell at the end of the short hallway to the righthand side as entering the main door to the intake, and all is literally in view from the public area, except the hallway which is basic with a few cells on either side and at the end where Plaintiff was placed after being forced to strip and change out. Fingerprints were taken, photographs were taken, and all without Plaintiff's permission, as Plaintiff did not consent whatsoever.

Plaintiff appealed the denial to the Kentucky Attorney General, who rendered a decision on December 23, 2025, upholding Defendants' denial based on Plaintiff's lack of Kentucky residency. This application of state open records law to deny a torture victim access to evidence of his own torture violates federal law and Due Process.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 26(d)(1) generally prohibits discovery before the parties have conferred pursuant to Rule 26(f), "except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order." Courts possess discretion to authorize expedited discovery upon a showing of good cause.

Good cause for expedited discovery exists when: (1) the information sought is necessary to adequately prepare a case or motion; (2) the information is not otherwise available; and (3) there is a danger that evidence will be lost or destroyed. Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority, 242 F.R.D. 139, 142 (D.D.C. 2007); see also Stinson v. City of New York, 2009 WL 1424582, at *2 (S.D.N.Y. May 19, 2009).

Additionally, courts have inherent authority to preserve evidence and prevent spoliation. "The power to make orders which will preserve the subject of the controversy and protect the interests of the parties is inherent in the court." Halas v. Consumer Safety Glazing Committee, 80 F.R.D. 346, 348 (N.D. Ill. 1978). This inherent authority extends to ordering immediate production of evidence at risk of destruction.

## IV. ARGUMENT

### A. Good Cause Exists for Immediate Expedited Discovery

All three elements of the good cause standard are satisfied here.

### 1. The Evidence is Necessary to Adequately Prepare and Prove Plaintiff's Case

The video and audio evidence sought is not merely helpful—it is critical and irreplaceable. This evidence will conclusively establish or refute virtually every material fact at issue in this case:

**A. Jurisdictional Issues:**
1. Body camera footage will show the Diplomatic Ambassador At Large plates clearly displayed on Plaintiff's automobile;
2. Body camera and dispatch audio will show Plaintiff's verbal communications regarding his status;
3. Body camera will show Plaintiff's offer to provide documentation and officers' refusal to examine it;
4. Body camera and dispatch audio will show whether officers made any inquiry or investigation into jurisdiction;
5. This evidence will prove that officers violated Kentucky precedent requiring jurisdictional investigation before action.

**B. False Arrest and Fourth Amendment Violations:**
1. Evidence will show officers had no warrant;
2. Evidence will show Plaintiff was compliant and non-resistant;
3. Evidence will show officers had no probable cause for arrest;
4. Evidence will prove the arrest was unlawful from inception.

**C. Torture and Excessive Force:**
1. Jail surveillance will show the point-blank OC spray attack, proving the "four feet" documentation is a lie;
2. Surveillance will show Plaintiff was facing a wall, compliant and non-resistant when attacked;
3. Surveillance will show the twelve-hour restraint chair torture;
4. Surveillance will show the sexual assault with OC spray applied to genitals;
5. Surveillance will show officers' mockery and laughter during torture;
6. This evidence will prove violations of 18 U.S.C. § 2340A, the Fourth Amendment, and Eighth Amendment.

**D. Deliberate Indifference to Medical Needs:**
1. Surveillance will show Plaintiff's obvious distress;

### 2. Audio will capture Plaintiff's requests for medical assistance;
3. Evidence will show officers' refusal to provide medical care;
4. This evidence will prove Eighth Amendment violations under Estelle v. Gamble.

**E. First Amendment Retaliation:**
1. Evidence will show the entire sequence of events was triggered by Plaintiff's assertion of his rights;
2. Evidence will show officers' hostile response to Plaintiff's communications;
3. Chief Yeary's threats will show retaliation for exercise of constitutional rights.

**F. Chief Yeary's Personal Liability and Monell Claims:**
1. Surveillance will show Chief Yeary's personal appearance during release;
2. Surveillance and audio will show Chief Yeary supervising the ripping of paperwork from Plaintiff's hands;
3. Audio will capture Chief Yeary's threats to revoke bail and to subject Plaintiff to additional torture;
4. This evidence will establish Chief Yeary's personal liability and ratification of torture, making the City of Harlan liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

**G. Financial Motive and RICO Pattern:**
1. Financial records will show whether Defendants profit from arrests through securitization, bonds, or grant incentives;
2. CUSIP and EIN documentation will establish the financial enterprise underlying unconstitutional arrests;
3. This evidence will support RICO claims under 18 U.S.C. § 1962 and establish pattern and practice.

**H. Credibility:**
1. Most importantly, the video and audio evidence will establish whose account is truthful;
2. Without this evidence, the case becomes a swearing contest between Plaintiff and Defendants;
3. With this evidence, the truth will be incontrovertible.

**The necessity of this evidence cannot be overstated. It is the difference between a case that relies on testimony and a case that presents objective, irrefutable proof of torture and constitutional violations.**

## 2. The Evidence is Not Otherwise Available

The evidence is in the exclusive possession, custody, and control of Defendants. Plaintiff has no other means to obtain body camera footage from Harlan City Police officers, surveillance video from Harlan County Detention Center, dispatch audio recordings, or internal financial records. Plaintiff cannot recreate this evidence. Plaintiff cannot substitute this evidence with other proof. If Defendants destroy this evidence, it is permanently lost.

This is not a situation where Plaintiff could obtain similar evidence from alternative sources. This evidence is unique, irreplaceable, and exclusively held by Defendants.

## 3. There is Imminent Danger Evidence Will Be Lost or Destroyed

This is the most critical factor and the reason this motion is brought on an emergency basis.

**Time Elapsed:** The incident occurred on October 16-17, 2025. As of the filing of this motion, seventy-seven (77) days have elapsed. Standard retention periods for law enforcement body camera footage, jail surveillance video, and dispatch audio are typically 30-90 days unless specifically flagged for preservation. The evidence may already be scheduled for automatic deletion.

**Defendants' Refusal to Preserve:** Despite Plaintiff's multiple written demands for preservation made within weeks of the incident, Defendants have refused to preserve the evidence. This refusal, combined with the passage of time, creates an imminent risk of destruction.

**Defendants' Demonstrated Willingness to Falsify Records:** The official jail documentation states that OC spray was administered from "four feet" when it was actually point-blank range. This is not an innocent mistake or estimation error. This is a deliberate lie designed to make the torture appear less severe than it actually was. Defendants' willingness to falsify written documentation demonstrates their willingness to destroy or tamper with video evidence that would expose the lie.

**Defendants' Motive to Destroy Evidence:** Defendants face potential criminal prosecution under 18 U.S.C. § 2340A (torture), 18 U.S.C. § 242 (deprivation of rights under color of law), and civil liability for millions of dollars in damages. The video evidence will conclusively prove they tortured Plaintiff. Defendants have every motive to destroy this evidence.

**Spoliation Precedent:** Courts have repeatedly held that parties must preserve evidence once litigation is reasonably anticipated. In Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003), the court stated: "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."

Defendants were on notice of potential litigation from the moment Plaintiff began asserting his rights and threatening lawsuits during the detention. Plaintiff made written preservation demands shortly after release. Defendants have been on notice of litigation for over two months. Any destruction of evidence at this point constitutes spoliation warranting severe sanctions.

## 4. The Evidence Sought is Critical and Irreplaceable

Unlike many civil cases where evidence can be recreated through testimony or alternative documentation, the evidence at issue here is unique and irreplaceable. Video footage of the point-blank chemical weapon attack cannot be substituted with testimony. Surveillance footage of twelve hours of restraint chair torture cannot be recreated. Audio recordings of Chief Yeary's threats cannot be replaced with after-the-fact recollections.

Moreover, this evidence goes to the heart of the constitutional violations alleged. In Hope v. Pelzer, 536 U.S. 730 (2002), a case involving handcuffing of a prisoner to a hitching post, the Supreme Court emphasized the importance of the specific facts and circumstances in evaluating Eighth Amendment claims. The Court's analysis depended heavily on the particular details of how long the prisoner was restrained, under what conditions, and with what level of pain and suffering.

Similarly, here, the video evidence will show the exact circumstances of the torture: the distance from which OC spray was administered, the duration of restraint, Plaintiff's visible distress, officers' reactions and statements, and the overall conditions. These specific facts are critical to establishing the severity of the constitutional violations and defeating any qualified immunity defense.

## 5. Evidence is at Imminent Risk of Destruction

### a. Automatic Deletion Policies

Law enforcement agencies typically maintain body camera footage, jail surveillance video, and dispatch audio for limited periods ranging from 30 to 90 days. After this period, unless the footage has been specifically flagged for retention, it is automatically deleted to conserve digital storage space.

Given that 77 days have elapsed, the evidence may be scheduled for deletion at any moment. Each day of delay increases the likelihood that automatic deletion will occur before this Court can intervene.

### b. Manual Destruction Risk

Beyond automatic deletion, there is substantial risk that Defendants will manually destroy evidence to conceal their misconduct. Defendants have already demonstrated:

1. Willingness to falsify records (the "four feet" lie about OC spray distance); 2. Refusal to preserve evidence despite written demands; 3. Use of pretextual justifications to deny production; 4. Knowledge that the evidence will prove torture and constitutional violations; 5. Awareness that they face potential criminal prosecution and massive civil liability.

These factors create a perfect storm for spoliation. Defendants know the evidence exists, know what it shows, know they will face severe consequences if it is produced, and have already shown willingness to falsify records. The risk of manual destruction is substantial and immediate.

### c. The "Security Concerns" Pretext

Harlan County's claimed "security concerns" for denying surveillance footage is demonstrably pretextual. The processing area where the torture occurred is visible from the public waiting room through a glass door. Plaintiff's wife stood in that waiting room and witnessed portions of the events. If members of the public can view the area in real-time, there are no legitimate security concerns preventing production of surveillance footage.

This pretextual justification suggests Defendants are manufacturing reasons to avoid producing evidence, which in turn suggests they may be laying groundwork for claiming the footage was "lost" or "accidentally deleted" or subject to some exception that prevents production.

## 6. Defendants Have Demonstrated Willingness to Falsify Records and Conceal Evidence

The false "four feet" statement in the OC spray documentation is not a minor discrepancy. It is direct evidence of Defendants' consciousness of guilt and willingness to falsify official records to conceal the severity of their misconduct.

When "JJ" administered OC spray to Plaintiff's face, he was inches away—close enough that the pressure and volume of the spray forced open Plaintiff's eyelids. This is point-blank range by any definition. Yet the official documentation states "four feet." This false statement serves two purposes:
(1) it makes the use of force appear more reasonable and less severe; and
(2) it creates a paper record contradicting any claim of point-blank administration.

This falsification demonstrates:
1. Defendants know the close-range administration was improper;
2. Defendants are willing to create false documentation to cover up misconduct;
3. Defendants understand the importance of the distance in evaluating the severity

of force;

4. Defendants will lie to protect themselves from liability.

If Defendants will falsify written reports, they will certainly destroy or tamper with video evidence that conclusively proves the falsification. The "four feet" lie actually strengthens Plaintiff's argument for immediate preservation because it shows Defendants have both motive and demonstrated willingness to tamper with evidence.

## 7. The Privacy Act Violations Support Immediate Discovery

Under the Privacy Act of 1974, 5 U.S.C. § 552a(e)(3), agencies collecting information from individuals must inform them of: (a) the authority authorizing the solicitation; (b) whether disclosure is mandatory or voluntary; (c) principal purposes for use; (d) routine uses; and (e) effects of not providing information.

Defendants demanded that Plaintiff provide state-issued identification and personal information without providing any of these required disclosures. This Privacy Act violation demonstrates that Defendants had no lawful statutory authority to demand the information, which in turn demonstrates they had no jurisdiction to arrest or detain Plaintiff for refusing to provide it.

Discovery regarding what statutory authority, if any, Defendants believed authorized their demands for identification will establish that no such authority exists for compelling a non-citizen national to provide state-issued identification. This discovery supports both the jurisdictional arguments and the false arrest claims.

## 8. Financial Discovery is Necessary to Establish RICO Pattern and Motive

Plaintiff seeks discovery of financial records including CUSIP numbers, bond instruments, EIN, tax documents, and revenue records related to arrests and detentions. This discovery is necessary to establish:

### i. Financial Motive for Unconstitutional Arrests

If counties and municipalities profit from arrests through securitization of cases, bond issuance, or federal/state grant programs tied to arrest statistics, this creates a financial motive for arrests without jurisdiction or probable cause. Evidence of such financial incentives would support:

a. RICO claims under 18 U.S.C. § 1962 (enterprise engaged in pattern of racketeering activity);
b. Monell claims showing policy or custom of arrests-for-profit;
c. Punitive damages based on financial enrichment from constitutional violations;
d. Pattern and practice evidence showing systemic rather than isolated violations.

## ii. UCC § 9-210 Accounting Rights

Under UCC § 9-210, a debtor has a statutory right to demand from a secured party: (a) accounting of unpaid obligations secured by collateral; (b) list of collateral securing obligation; and (c) statement of account. The secured party must respond within fourteen (14) days.

If Plaintiff's arrest was securitized (i.e., his case was used as collateral for bonds or other financial instruments), Plaintiff as the subject of the securitization has a right to demand accounting under UCC § 9-210. Defendants' failure to respond to such demand would constitute both a UCC violation and discovery abuse warranting adverse inference.

## iii. IRS Whistleblower Foundation

Discovery of EIN and tax documentation lays the foundation for potential IRS whistleblower claim under IRC § 7623 if Defendants have failed to report income from securitized cases. If Defendants are profiting from arrests but not reporting that income to the IRS, Plaintiff can file Form 211 alleging tax fraud, which would trigger IRS investigation and create additional federal oversight of Defendants' financial practices.

## iv. Standard Discovery Timeline Would Result in Irreparable Prejudice

If this Court denies expedited discovery and requires Plaintiff to follow the standard discovery timeline under Federal Rule of Civil Procedure 26, irreparable prejudice will result.

Under Rule 26(f), parties must confer to develop a discovery plan, which typically occurs weeks or months after the complaint is filed. Initial disclosures under Rule 26(a)(1) follow the conference. Document requests under Rule 34 come after initial disclosures, with responses due 30 days after service. This standard timeline could easily extend 60-90 days or more from the filing of the complaint.

The incident occurred 77 days ago. If this Court imposes a standard discovery timeline adding another 60-90 days, the evidence will be 137-167 days old before Defendants are required to produce it. No law enforcement body camera footage or jail surveillance video is retained for that long absent specific preservation orders. The evidence will be gone.

Moreover, each day of delay increases the risk of purposeful destruction. Defendants know this lawsuit has been filed. They know the evidence exists. They know what it shows. Each day this Court delays in ordering preservation is another day Defendants can "accidentally" delete footage or claim it was "lost" in a "computer malfunction."

The irreparable prejudice is not speculative. It is certain. Without this Court's immediate intervention, the evidence will be destroyed, and Plaintiff will be unable to prove his claims despite having been tortured in violation of federal criminal statutes and clearly established constitutional law.

## v. Public Policy Favors Preservation of Evidence of Torture and Constitutional Violations

This is not a routine civil case involving a business dispute or property damage. This case involves allegations of torture in violation of 18 U.S.C. § 2340A, a federal criminal statute that Congress enacted to implement the United Nations Convention Against Torture.

The public has a compelling interest in ensuring that allegations of torture by government officials are fully investigated and that evidence is preserved. The destruction of evidence showing government officials torturing a pretrial detainee would undermine the rule of law, enable future misconduct, and prevent accountability for grave constitutional violations.

In Hope v. Pelzer, 536 U.S. 730, 738 (2002), the Supreme Court stated: "The Eighth Amendment's prohibition of 'cruel and unusual punishments' necessarily excludes from constitutional recognition those measures that do not comport with 'the evolving standards of decency that mark the progress of a maturing society.'" Torture of pretrial detainees violates the most basic standards of decency. Allowing evidence of such torture to be destroyed would be unconscionable.

Courts have consistently recognized that preservation of evidence in civil rights cases serves important public policy goals beyond the individual plaintiff's interest. The evidence here documents potential criminal conduct by law enforcement officials. Its preservation serves not only Plaintiff's individual interest in proving his claims, but also the public's interest in accountability, deterrence, and reform.

## V. CONCLUSION

This is an emergency. Critical evidence proving torture and systematic constitutional violations is at imminent risk of destruction. Seventy-seven days have elapsed since the incident. Standard retention periods for video and audio evidence are expiring. Defendants have refused to preserve evidence despite written demands. Defendants have demonstrated willingness to falsify records. Defendants have powerful motives to destroy evidence that will prove they tortured Plaintiff in violation of federal criminal law.

Good cause for expedited discovery is clearly established. The evidence is necessary, unavailable from other sources, and at imminent risk of destruction. Standard discovery timelines would result in irreparable prejudice and permanent loss of critical evidence.

The video and audio evidence will conclusively establish the truth of what occurred on October 16-17, 2025. It will show the diplomatic plates. It will show Plaintiff's communications. It will show officers' refusal to investigate jurisdiction. It will show the point-blank chemical weapon attack. It will show twelve hours of restraint chair torture. It will show the sexual assault. It will show the denial of medical care. It will show Chief Yeary's threats. It will prove the "four feet" documentation is a lie. It will establish that Defendants tortured Plaintiff.

Plaintiff respectfully requests that this Court grant the Emergency Motion for Expedited Discovery, order Defendants to immediately preserve all evidence, and require production within the abbreviated timelines requested in the motion. Justice and the rule of law require nothing less.

RESPECTFULLY SUBMITTED this _02_ day of _January_ , 2026.

_William Bolt, agent / WILLIAM MATTHEW BOLT, principle_

William Bolt, agent and trustee
Attorney-in-fact for WILLIAM MATTHEW BOLT
Freeman of the Union
WITHOUT the "United States" at all times
Sultan of the Nation of GNAR
Ambassador of the Nation of GNAR
Ambassador of the Nation of Pluto Coalition
Non-citizen national, 8 U.S.C. § 1101(a)(14)
Internationally protected person
All rights reserved pursuant to UCC 1-308

**CONTACT INFORMATION:**

William Bolt
c/o Carol Bolt
5264 S. Liberty Pike
Liberty, IN 47353
Phone: (970) 409-8417

**END OF MEMORANDUM IN SUPPORT**

All Rights Reserved

UCC 1-308

End

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

Eastern District of Kentucky
FILED

JAN - 2 2026

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

William Bolt, agent /
**WILLIAM MATTHEW BOLT, principal;**

Case No.: 6:26 - Cv -54


**Plaintiff,**

v.

CITY OF HARLAN, KENTUCKY;
WINSTON H. "WINK" YEARY JR., individually and in his official capacity as City of Harlan, Kentucky, Chief of Police;
JOHN DOE OFFICERS 1-2, individually and in their official capacities as City of Harlan, Kentucky, Police Officers;
HARLAN COUNTY, KENTUCKY;
BJ BURKHART, individually and in his official capacity as Harlan County Jailer;
JOHN DOE JAILER "JJ", individually and in his official capacity;
JANE DOE JAILER 1, individually and in her official capacity;
JOHN DOE JAILERS 2-6, individually and in their official capacities;
JOHN DOE SHERIFF DEPUTY, individually and in his official capacity
HUDDLE HOUSE, INC.;
JANE DOE HUDDLE HOUSE MANAGER;
COLES AUTOBODY AND TOWING;
JOHN DOE DEFENDANTS 7-12,

**Defendants.**

---

# EMERGENCY MOTION FOR EXPEDITED DISCOVERY / INSPECTION / PRESERVATION OF EVIDENCE

---

Plaintiff William Bolt, by and through his capacity as agent and trustee, respectfully moves this Court pursuant to Federal Rules of Civil Procedure 26(d)(1) and 34 for an order permitting immediate expedited discovery and requiring Defendants to preserve and produce critical evidence that is at imminent risk of destruction. In support of this motion, Plaintiff states as follows:

## I. INTRODUCTION AND EMERGENCY NATURE

This is an emergency motion. Critical evidence that will prove Plaintiff's claims of torture, chemical weapon assault, sexual assault, false arrest, and constitutional violations is at imminent risk of automatic deletion or purposeful destruction by Defendants. The incident giving rise to this action occurred on October 16-17, 2025. As of the filing of this motion, close to Eighty (80) days have elapsed since the incident. Body-worn camera footage, jail surveillance video, and dispatch audio recordings are typically retained for only 30-90 days unless specifically flagged for preservation, which Plaintiff has very much tried to demand.

Despite Plaintiff's multiple written demands for preservation of evidence, Defendants have either ignored these demands or actively refused to preserve and produce the evidence, claiming Plaintiff lacks standing to request his own evidence under Kentucky open records law because he is not a Kentucky resident. Defendants' refusal to preserve evidence, combined with the passage of time and standard retention policies, creates an imminent risk that critical video and audio evidence will be permanently destroyed within days if this Court does not intervene immediately.

The evidence at issue is absolutely critical to proving Plaintiff's claims. This evidence includes video footage showing: the point-blank chemical weapon attack on a non-resistant detainee; twelve hours of restraint chair torture; sexual assault with OC spray; denial of medical care during a medical emergency; gang intimidation tactics by multiple officers; and Chief of Police Winston H. "Wink" Yeary Jr.'s personal participation in threatening Plaintiff with additional torture during release. Without this evidence, Plaintiff's ability to prove Defendants' misconduct and establish the truth of what occurred will be severely prejudiced.

## II. FACTUAL BACKGROUND

On October 16, 2025, at approximately 6:00 p.m. Eastern Time, Defendant Officers of the Harlan City Police Department stopped Plaintiff's automobile in Harlan, Kentucky. Plaintiff's automobile displayed Diplomatic Ambassador At Large license plates clearly visible to the officers. Plaintiff immediately communicated his status as Sultan, Ambassador, non-citizen national under 8 U.S.C. § 1101(a)(14), and internationally protected person. Plaintiff offered documentation supporting his status. The officers refused to examine documentation and refused to investigate jurisdiction despite clear indicators requiring such investigation under Kentucky precedent established in Ex Parte Knowles, 5 Cal. 301-307 (1855) and Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013).

Despite lacking jurisdiction, lacking probable cause, and lacking a warrant, Defendant Officers arrested Plaintiff and transported him to the Harlan County Detention Center. Over the following twenty (20) hours, Plaintiff was subjected to torture including:

A. Chemical weapon assault with oleoresin capsicum (OC) spray administered at point-blank range directly to Plaintiff's face while Plaintiff stood compliant and non-resistant. Jail documentation falsely states OC spray was administered from "four feet" when it was actually point-blank range, demonstrating Defendants' knowledge that the close-range administration was improper and their willingness to falsify records.

B. Twelve (12) hours of continuous restraint in a restraint chair from approximately 7:00 p.m. October 16, 2025 to approximately 7:00 a.m. October 17, 2025, causing circulation to be cut off to Plaintiff's arm, severe cramping and pain

2 of 10

throughout body, inability to move, and psychological torture including being told to defecate and urinate on himself.

C. Sexual assault with OC spray applied to Plaintiff's genitals via contaminated water while Plaintiff was helplessly strapped in the restraint chair, causing severe burning pain in an intimate area.

D. Denial of medical care despite Plaintiff's complaints of chest pain, difficulty breathing, fear of imminent death, and obvious medical distress from the torture.

E. Gang intimidation tactics with four (4) detention officers simultaneously appearing at Plaintiff's cell to threaten him with additional violence.

F. Personal appearance by Chief of Police Winston H. "Wink" Yeary Jr. during Plaintiff's release on October 17, 2025, during which Chief Yeary supervised officers ripping paperwork from Plaintiff's hands and threatened Plaintiff with additional torture, stating "We'll call the judge, revoke your bail, and you'll be OC'd again...or worse."

## III. CRITICAL EVIDENCE AT RISK OF DESTRUCTION

The events described above were captured on body-worn cameras, jail surveillance cameras, and dispatch audio recordings in the possession of Defendants. This evidence is critical to proving Plaintiff's claims and includes:

### A. Body-Worn Camera Footage from Harlan City Police Officers

Body camera footage from Defendant Officers John Doe 1-2 who conducted the traffic stop, arrest, and transport on October 16, 2025, will show:

1. Diplomatic Ambassador At Large license plates clearly displayed on rear of Plaintiff's automobile;
2. Plaintiff's verbal communications to officers regarding his status as Sultan, Ambassador, non-citizen national, and internationally protected person;
3. Plaintiff's offer to provide documentation supporting his status;
4. Officers' refusal to examine documentation or investigate jurisdiction;
5. Plaintiff's disclosure and multiple verbal acceptances of contract terms couped with performance on contract at the rate of Ten Thousand U.S. Dollars ($10,000.00) per minute elapsed during unlawful detention;
6. Officers' acknowledgment of and agreement to contract terms through conduct;
7. Plaintiff's complete lack of violence during arrest;
8. Officers' use of force during arrest;
9. Officers' failure to provide Miranda warnings;
10. Officers' communications regarding jurisdictional issues or lack thereof;
11. Any requests for supervisory guidance or legal advice;
12. Transport to detention center and communications during transport.

### B. Jail Surveillance Video from Harlan County Detention Center

3 of 10

Surveillance footage from the Harlan County Detention Center from October 16-17, 2025, will show:

1. Intake processing and Plaintiff's continued assertions of status and jurisdictional issues;
2. The point-blank OC spray attack on Plaintiff's face by Defendant "JJ" while Plaintiff stood facing a wall, compliant and non-resistant;
3. Officers forcibly strapping Plaintiff into restraint chair immediately after OC spray attack;
4. Twelve (12) hours of Plaintiff restrained in chair from approximately 7:00 p.m. October 16 to approximately 7:00 a.m. October 17, 2025;
5. Defendant Jane Doe Jailer 1 applying contaminated water to Plaintiff's face and genitals containing OC spray residue, constituting sexual assault;
6. Plaintiff's obvious physical distress, inability to move, requests for bathroom access, requests for water, and requests for medical assistance;
7. Officers' denial of Plaintiff's requests for basic necessities and medical care;
8. Officers' mockery and laughter during torture;
9. Gang intimidation tactics with four (4) officers simultaneously threatening Plaintiff;
10. Forced strip search under threat of additional violence;
11. Chief of Police Winston H. "Wink" Yeary Jr.'s personal appearance during Plaintiff's release on October 17, 2025;
12. Officers ripping paperwork from Plaintiff's hands during release processing;
13. Chief Yeary's supervision of threats and his participation in threatening Plaintiff with revocation of bail and additional torture.

C. The surveillance footage from the intake and processing area is particularly critical. Plaintiff's wife, Alice Cox, was able to view a substantial portion of this area through the glass door of the waiting room, demonstrating that Defendants claimed "security concerns" for denying access to the footage are pretextual. The footage will show the entire sequence of events from arrival through torture through release.

**D. Dispatch Audio Recordings**

Dispatch audio recordings from October 16-17, 2025, will show:

1. Initial call from Huddle House or other source that precipitated the traffic stop;
2. Communications between Defendant Officers during the stop;
3. Communications regarding Plaintiff's status, diplomatic plates, and jurisdictional issues;
4. Any requests for guidance from supervisors or legal advisors;
5. Communications regarding Plaintiff's arrest and transport;
6. Communications between Harlan City Police and Harlan County Detention Center;
7. Any communications regarding use of force or medical issues.

**E. Incident Reports, Booking Records, and Medical Records**

All written documentation including:

1. Incident reports from arresting officers;
2. Booking records and intake documentation;

3. Use of force reports, including the false report claiming OC spray was administered from "four feet";
4. Medical screening records;
5. Restraint chair authorization and monitoring logs;
6. Any medical treatment or evaluation records;
7. Release paperwork;
8. Any supervisory review documentation;
9. Complaint or grievance filings by other detainees affected by the excessive OC spray;
10. Any internal investigation materials.

## F. Financial and Administrative Records

In addition to video, audio, and written incident documentation, Plaintiff seeks immediate production of financial and administrative records that will establish Defendants' financial interest in unlawful arrests and detentions, including:

1. Any CUSIP number, bond instrument, financial security, or debt obligation created, issued, assigned, or associated with the arrest, detention, or prosecution of William Bolt on October 16-17, 2025, including any securitization of said case for investment, trading, or revenue generation purposes;
2. The Employer Identification Number (EIN) under which any revenue, interest, or financial benefit derived from the arrest, detention, or case of William Bolt was reported to the Internal Revenue Service, including all Forms 1099, 8281, or other tax documents related to financial instruments;
3. All documents showing payments, revenues, incentives, grants, or other financial benefits received by Defendants, Harlan City Police, Harlan County, or any related entity from federal, state, or private sources based on arrest rates, detention statistics, case filings, or related metrics for the period including October 2025;
4. Complete chain of title for any financial instruments related to Plaintiff's case;
5. All contracts, agreements, or arrangements between Defendants and any financial institutions, investment entities, or government agencies related to monetization of arrests, detentions, or prosecutions;
6. Under UCC § 9-210, Plaintiff requests accounting of any unpaid obligations secured by collateral, list of collateral securing obligations, and statement of account showing aggregate amount owed, with Defendants required to respond within fourteen (14) days. Failure to respond constitutes both a UCC violation and discovery abuse warranting adverse inference.

## G. Policies, Training Materials, and Personnel Files

1. All policies and procedures of Harlan City Police Department and Harlan County Detention Center regarding:
    o Jurisdictional investigation requirements;
    o Traffic stops and arrest procedures;
    o Use of force, including chemical weapons;
    o Restraint chair use;
    o Medical care for detainees;
    o Strip search procedures;
    o Evidence preservation;
2. Training materials and records showing what training, if any, officers received on:
    o Jurisdictional requirements under Kentucky precedent;

5 of 10

- o Constitutional rights of non-citizen nationals;
- o Internationally protected persons;
- o Diplomatic credentials and plates;
- o Use of force limitations;
- o Medical care duties;
3. Personnel files for all Defendant officers, including:
  - o Prior complaints of excessive force;
  - o Disciplinary records;
  - o Training records;
  - o Use of force incidents;
  - o Any prior incidents involving jurisdictional issues.

## IV. DEFENDANTS' REFUSAL TO PRESERVE AND PRODUCE EVIDENCE

Plaintiff has made multiple written demands to Defendants for preservation and production of evidence. Defendants have either ignored these demands or refused to comply, claiming that Plaintiff does not qualify under Kentucky open records statutes because he is not a Kentucky resident and does not have a business presence in Kentucky.

Specifically, Harlan County Detention Center responded to Plaintiff's public records request by claiming "security concerns" as justification for denial, despite the fact that the processing area is visible from the public waiting room where Plaintiff's wife stood and witnessed the events. This stated justification is pretextual and demonstrates Defendants' intent to conceal evidence of their misconduct.

Plaintiff appealed the denial to the Kentucky Attorney General, who rendered a decision on December 23, 2025, upholding Defendants' denial based on Plaintiff's lack of Kentucky residency or business presence. This application of Kentucky open records law to deny Plaintiff access to critical evidence of torture and constitutional violations perpetrated against him violates federal law and Due Process.

Defendants' refusal to preserve and produce evidence, combined with their false documentation (claiming OC spray was administered from "four feet" when it was point-blank), demonstrates a pattern of concealment and evidence tampering that necessitates immediate Court intervention.

## V. LEGAL STANDARD FOR EXPEDITED DISCOVERY

Federal Rule of Civil Procedure 26(d)(1) provides that "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order."

Courts may authorize expedited discovery upon a showing of good cause. Good cause exists when: (1) the information sought is necessary to adequately prepare a case or motion; (2) the information is not otherwise available; and (3) there is a danger that evidence will be lost or destroyed. Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority, 242 F.R.D. 139, 142 (D.D.C. 2007).

Additionally, under Federal Rule of Civil Procedure 34, a party may request production of documents in the responding party's possession, custody, or control. This Court has authority

6 of 10

to order production of evidence necessary to prevent spoliation and to ensure that critical evidence is preserved for trial.

## VI. GOOD CAUSE EXISTS FOR IMMEDIATE EXPEDITED DISCOVERY

### A. The Evidence is Absolutely Necessary to Adequately Prepare and Prove Plaintiff's Case

The video and audio evidence sought is not merely helpful to Plaintiff's case—it is absolutely critical and irreplaceable. This evidence will conclusively establish:

1. That Plaintiff's automobile displayed diplomatic plates visible to officers;
2. That Plaintiff verbally communicated his status and jurisdictional issues to officers;
3. That Plaintiff offered documentation which officers refused to examine;
4. That officers conducted no investigation of jurisdiction despite clear indicators;
5. That Plaintiff was subjected to point-blank chemical weapon attack, not "four feet" as falsely documented;
6. That Plaintiff was non-resistant and compliant throughout;
7. The exact duration and conditions of restraint chair torture;
8. That Plaintiff requested medical care which was denied;
9. That Chief Yeary personally participated in threatening Plaintiff;
10. The credibility of Plaintiff's account versus any false statements by Defendants.

Without this evidence, the case devolves into a swearing contest between Plaintiff and Defendants. The video and audio evidence will conclusively establish the truth. The financial records will establish Defendants' monetary incentive for unconstitutional arrests and detentions.

### B. The Evidence is Not Otherwise Available

The video and audio evidence is in the exclusive possession, custody, and control of Defendants. Plaintiff has no other means to obtain this evidence. Plaintiff cannot recreate or substitute this evidence. If Defendants destroy this evidence, it is lost forever.

The financial records regarding CUSIP numbers, bond instruments, EIN, and revenue from arrests are similarly in Defendants' exclusive possession. Plaintiff cannot obtain this information from any other source.

### C. There is Imminent Danger that Evidence Will Be Lost or Destroyed

This is the most critical factor. The incident occurred on October 16-17, 2025. Seventy-seven (77) days have now elapsed. Body-worn camera footage, jail surveillance video, and dispatch audio are typically retained for only 30-90 days unless specifically flagged for preservation which plaintiff has records of attempting of which all requests have been denied.

Defendants have already demonstrated their willingness to falsify records by claiming OC spray was administered from "four feet" when it was point-blank. Defendants have refused Plaintiff's preservation demands. Defendants have claimed pretextual reasons to deny Plaintiff access to evidence. Defendants have a clear motive to destroy evidence that proves they tortured Plaintiff in violation of 18 U.S.C. § 2340A and multiple constitutional provisions.

7 of 10

Unless this Court intervenes immediately, the evidence will be automatically deleted pursuant to standard retention policies, or purposefully destroyed by Defendants to conceal their misconduct. Once destroyed, the evidence cannot be recovered.

## D. Spoliation of Evidence and Adverse Inference

The law is clear that destruction of evidence, whether intentional or negligent, warrants severe sanctions including adverse inference. In Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003), the court held that "once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."

Defendants were on notice of potential litigation from the moment Plaintiff began asserting his rights, disclosing contract terms, and threatening lawsuits during the detention. Plaintiff made written preservation demands shortly after release. Defendants have been on notice of litigation for over two months. Any destruction of evidence at this point would constitute spoliation warranting adverse inference that the destroyed evidence would have supported Plaintiff's claims.

## VII. IMMEDIATE PRODUCTION IS NECESSARY

Given the imminent risk of evidence destruction and the 77-day manufactured delay by defendants since the incident, Plaintiff respectfully requests that this Court order Defendants to produce all requested evidence within five (5) days of this Court's order. This abbreviated timeline is necessary because:

1. Standard retention periods for video and audio may expire any day;
2. Defendants have already refused voluntary preservation and production;
3. Defendants have demonstrated willingness to falsify records;
4. The evidence is readily available in Defendants' computer systems and does not require extensive search or compilation;
5. Defendants are law enforcement and detention agencies with legal departments familiar with evidence production;
6. Any further delay increases the risk of purposeful or automatic destruction.

## VIII. PROPOSED DISCOVERY SCHEDULE

Plaintiff proposes the following expedited discovery schedule:

**Day 1:** Court enters order granting this motion and requiring preservation and production.

**Day 2:** Defendants implement litigation hold on all evidence and provide written certification to Court and Plaintiff that hold has been implemented.

**Day 5:** Defendants produce all body-worn camera footage, jail surveillance video, dispatch audio, incident reports, booking records, medical records, use of force reports, and restraint chair logs.

**Day 14:** Defendants produce all financial records including CUSIP documentation, EIN, tax forms, revenue records, and UCC § 9-210 accounting.

**Day 21:** Defendants produce all policies, training materials, and personnel files.

**Day 30:** Defendants respond to Plaintiff's Rule 34 Request for Production of Documents (filed concurrently herewith).

This schedule allows Defendants reasonable time to compile comprehensive document production while ensuring that critical video and audio evidence is preserved and produced for inspection immediately, before it can be destroyed.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff William Bolt respectfully requests that this Court enter an order:

A. Granting this Emergency Motion for Expedited Discovery;

B. Ordering Defendants to immediately implement a litigation hold preserving all evidence related to this case, including but not limited to:

- All body-worn camera footage from October 16-17, 2025;
- All jail surveillance video from October 16-17, 2025;
- All dispatch audio from October 16-17, 2025;
- All documents, reports, records, emails, and communications related to Plaintiff's arrest, detention, and treatment;
- All financial records related to Plaintiff's case;
- All policies, training materials, and personnel files;

C. Requiring Defendants to provide written certification within two (2) days that litigation hold has been implemented;

D. Ordering Defendants to produce within five (5) days:

- All body-worn camera footage;
- All jail surveillance video;
- All dispatch audio;
- All incident reports, booking records, and medical records;

E. Ordering Defendants to produce within fourteen (14) days:

- All financial records including CUSIP, EIN, tax documents, and UCC § 9-210 accounting;

F. Ordering Defendants to produce within twenty-one (21) days:

- All policies, training materials, and personnel files;

G. Ordering Defendants to respond within thirty (30) days to Plaintiff's Rule 34 Request for Production of Documents;

H. Imposing sanctions against Defendants if evidence has been destroyed or is not timely produced, including:

9 of 10

1. Adverse inference that destroyed evidence would have supported Plaintiff's claims;
2. Monetary sanctions;
3. Striking of Defendants' defenses;
4. Such other sanctions as the Court deems appropriate;

I. Authorizing Plaintiff to depose witnesses and take other discovery as necessary to preserve testimony and evidence;

J. Granting such other and further relief as this Court deems just and proper.

**RESPECTFULLY FILED this** _02_ **day of** _January_ ____, **2026.**

_William Bolt, agent / WILLIAM MATTHEW BOLT, principle_

William Bolt, agent and trustee
Attorney-in-fact for WILLIAM MATTHEW BOLT
Freeman of the Union
WITHOUT the "United States" at all times
Ambassador of the Nation of GNAR
Ambassador of the Nation of Pluto Coalition
Non-citizen national, 8 U.S.C. § 1101(a)(14)
Internationally protected person
All rights reserved pursuant to UCC 1-308

**CONTACT INFORMATION:**

William Bolt
c/o Carol Bolt
5264 S. Liberty Pike
Liberty, IN 47353
Phone: (970) 409-8417

**END OF EMERGENCY MOTION FOR EXPEDITED DISCOVERY**

10 of 10

Eastern District of Kentucky
FILED

JAN - 2 2026

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# LEXINGTON DIVISION

**William Bolt, agent /**
 WILLIAM MATTHEW BOLT, principal;

Case No.: 6 : 26-cv-54

**Plaintiff,**

v.

CITY OF HARLAN, KENTUCKY;
WINSTON H. "WINK" YEARY JR., individually and in his official capacity as City of
Harlan, Kentucky, Chief of Police;
JOHN DOE OFFICERS 1-2, individually and in their official capacities as City of
Harlan, Kentucky, Police Officers;
HARLAN COUNTY, KENTUCKY;
BJ BURKHART, individually and in his official capacity as Harlan County Jailer;
JOHN DOE JAILER "JJ", individually and in his official capacity;
JANE DOE JAILER 1, individually and in her official capacity;
JOHN DOE SHERIFF, individually and in his official capacity
JOHN DOE JAILERS 2-6, individually and in their official capacities;
HUDDLE HOUSE, INC.;
JANE DOE HUDDLE HOUSE MANAGER;
COLES AUTOBODY AND TOWING;
JOHN DOE DEFENDANTS 7-12,

**Defendants.**

---

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO
## DEFENDANTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 34

---

**TO: ALL DEFENDANTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff William Bolt requests
that Defendants produce for inspection and copying the documents described below within
thirty (30) days of service of this request, or as otherwise ordered by the Court.

1 of 8

## I. DEFINITIONS AND INSTRUCTIONS

A. "Document" means any written, recorded, or graphic matter, however produced or reproduced, including but not limited to writings, drawings, graphs, charts, photographs, recordings, emails, text messages, electronic files, metadata, video recordings, audio recordings, and any other data compilations.

B. "Concerning" or "relating to" means referring to, describing, evidencing, or constituting.

C. "Plaintiff" means William Bolt, agent and trustee for WILLIAM MATTHEW BOLT, and the GNARLEY Ministry Trust.

D. "Incident" means the events of October 16-17, 2025, including Plaintiff's traffic stop, arrest, detention, torture, and release in Harlan, Kentucky.

E. "Detention Center" means the Harlan County Detention Center located at 6000 KY-38, Evarts, KY 40828, Harlan, Kentucky.

F. Each request shall be construed independently and not limited by reference to any other request.

G. If any document is withheld on the basis of privilege, provide a privilege log identifying the document, the privilege claimed, and the basis for the claim.

H. Produce documents in native format with all metadata intact unless otherwise specified.

## II. REQUESTS FOR PRODUCTION

### A. VIDEO AND AUDIO EVIDENCE

REQUEST NO. 1: All body-worn camera footage from Harlan City Police officers from October 16-17, 2025, including but not limited to footage from the traffic stop, arrest, transport, and any interactions with Plaintiff.

REQUEST NO. 2: All jail surveillance video from Harlan County Detention Center from October 16-17, 2025, including but not limited to footage from intake/processing areas, restraint chair locations, cells where Plaintiff was held, release areas, and any other locations where Plaintiff was present or visible.

REQUEST NO. 3: All dispatch audio recordings from October 16-17, 2025, including but not limited to calls regarding Plaintiff's traffic stop, arrest, detention, medical issues, or release.

REQUEST NO. 4: All 911 calls or other emergency calls related to the Incident, including any calls from Huddle House or other locations regarding Plaintiff.

### B. INCIDENT REPORTS AND DOCUMENTATION

REQUEST NO. 5: All incident reports, arrest reports, and supplemental reports related to Plaintiff's arrest on October 16, 2025.

REQUEST NO. 6: All booking records, intake documentation, and detention records for Plaintiff from October 16-17, 2025.

REQUEST NO. 7: All use of force reports related to the Incident, including but not limited to reports concerning the administration of OC spray to Plaintiff.

2 of 8

REQUEST NO. 8: All documents concerning the restraint chair, including authorization for use, monitoring logs, and records showing the duration of Plaintiff's restraint from October 16-17, 2025.

REQUEST NO. 9: All medical screening records, medical evaluation records, and medical treatment records for Plaintiff from October 16-17, 2025.

REQUEST NO. 10: All records of Plaintiff's requests for medical attention, bathroom access, water, or other assistance during his detention.

REQUEST NO. 11: All release paperwork and documentation from October 17, 2025, including documents Plaintiff attempted to sign before they were taken from his hands.

REQUEST NO. 12: All communications between officers, detention staff, supervisors, or other personnel concerning Plaintiff from October 16-17, 2025, including emails, text messages, radio communications, and memoranda.

## C. JURISDICTIONAL INVESTIGATION (OR LACK THEREOF)

REQUEST NO. 13: All documents showing any investigation into jurisdiction conducted by Defendant Officers before, during, or after Plaintiff's arrest on October 16, 2025.

REQUEST NO. 14: All documents showing any inquiry, research, or consultation regarding Plaintiff's status as Sultan, Ambassador, non-citizen national under 8 U.S.C. § 1101(a)(14), or internationally protected person.

REQUEST NO. 15: All documents concerning the Diplomatic Ambassador At Large license plates displayed on Plaintiff's automobile on October 16, 2025, including any photographs, reports, or communications about said plates.

REQUEST NO. 16: All documents showing any contact with federal agencies, legal counsel, or supervisors regarding jurisdictional issues related to Plaintiff.

REQUEST NO. 17: All documents concerning Kentucky precedent requiring jurisdictional investigation before action, including any training materials, policies, or legal memoranda regarding Ex Parte Knowles, 5 Cal. 301-307 (1855) or Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013).

## D. PRIVACY ACT COMPLIANCE

REQUEST NO. 18: All documents showing the statutory authority under which Defendant Officers demanded that Plaintiff provide state-issued identification on October 16, 2025.

REQUEST NO. 19: All documents showing compliance with the Privacy Act of 1974, 5 U.S.C. § 552a(e)(3), including any notices provided to Plaintiff regarding:
    (a) authority authorizing solicitation of information;
    (b) whether disclosure was mandatory or voluntary;
    (c) principal purposes for use;
    (d) routine uses; and
    (e) effects of not providing information.

## E. CONTRACT AND FEE SCHEDULE

REQUEST NO. 20: All documents concerning Plaintiff's verbal disclosure of the Ten Thousand Dollar ($10,000.00) per minute fee schedule for unlawful detention.

REQUEST NO. 21: All documents showing Defendants' acknowledgment, acceptance, agreement, or response to Plaintiff's contract disclosure.

REQUEST NO. 22: All documents showing any contract, agreement, or instrument establishing Plaintiff's consent to Kentucky jurisdiction or obligation to comply with Kentucky commercial vehicle statutes.

REQUEST NO. 23: Pursuant to Carpenter v. Longan, 83 U.S. 271 (1872), produce all contracts, notes, or instruments that Defendants claim authorize enforcement of traffic violations or commercial vehicle regulations against Plaintiff.

## F. FINANCIAL RECORDS - CUSIP, BONDS, AND SECURITIZATION

REQUEST NO. 24: All documents showing any CUSIP number, bond instrument, financial security, or debt obligation created, issued, assigned, or associated with the arrest, detention, or prosecution of William Bolt on October 16-17, 2025, including but not limited to any securitization of said case for investment, trading, or revenue generation purposes.

REQUEST NO. 25: The Employer Identification Number (EIN) under which any revenue, interest, or financial benefit derived from Plaintiff's arrest, detention, or case was reported to the Internal Revenue Service.

REQUEST NO. 26: All Forms 1099, 8281, or other tax documents related to financial instruments associated with Plaintiff's case.

REQUEST NO. 27: All documents showing the complete chain of title for any financial instruments related to Plaintiff's case, from creation through current ownership.

REQUEST NO. 28: All contracts, agreements, or arrangements between Defendants and any financial institutions, investment entities, bonding companies, or government agencies related to monetization, securitization, or financial benefit from arrests, detentions, or prosecutions.

## G. REVENUE AND FINANCIAL INCENTIVES

REQUEST NO. 29: All documents showing payments, revenues, incentives, grants, or other financial benefits received by Defendants, Harlan City Police, Harlan County, or any related entity from federal, state, or private sources based on arrest rates, detention statistics, case filings, or related metrics for the period including October 2025.

REQUEST NO. 30: All documents showing budget allocations, revenue projections, or financial planning based on anticipated arrests, detentions, or prosecutions.

REQUEST NO. 31: All documents concerning federal or state grant programs that provide funding based on law enforcement statistics, including applications, awards, and reporting requirements.

## H. UCC § 9-210 ACCOUNTING DEMAND

REQUEST NO. 32: Pursuant to UCC § 9-210, Plaintiff demands and requests:

 a. Accounting of any unpaid obligations secured by collateral related to Plaintiff or Plaintiff's case;

 b. List of all collateral securing any such obligations;

    c. Statement of account showing the aggregate amount of unpaid obligations secured by said collateral as of the date of this request.

**This request is made pursuant to Plaintiff's statutory right under UCC § 9-210. Defendants are required to respond within fourteen (14) days of this request. Failure to respond constitutes a UCC violation and will support adverse inference that financial instruments exist and are being concealed.**

## I. POLICIES, PROCEDURES, AND TRAINING MATERIALS

REQUEST NO. 33: All policies, procedures, standard operating procedures, and manuals in effect on October 16-17, 2025, concerning traffic stops, arrests, and jurisdictional determinations.

REQUEST NO. 34: All policies, procedures, and manuals concerning use of force, including use of OC spray, restraint chairs, and control techniques.

REQUEST NO. 35: All policies, procedures, and manuals concerning medical care for detainees, including procedures for responding to requests for medical attention and symptoms of medical emergencies.

REQUEST NO. 36: All policies, procedures, and manuals concerning strip searches and processing of detainees.

REQUEST NO. 37: All policies, procedures, and manuals concerning evidence preservation, body camera usage, and surveillance video retention.

REQUEST NO. 38: All training materials provided to Harlan City Police officers and Harlan County detention officers concerning jurisdictional requirements, constitutional rights of non-citizen nationals, internationally protected persons, diplomatic credentials, or special status indicators.

REQUEST NO. 39: All training materials concerning The Police Manual of Arrest § 21, which states officers must not use force to compel identification.

REQUEST NO. 40: All training materials concerning Texas v. Florida, 306 U.S. 398 (1939), World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980), Basso v. Utah Power & Light Co., 495 F.2d 906 (10th Cir. 1974), or any other case law regarding jurisdiction, due process, or burden of proof.

## J. PERSONNEL FILES AND DISCIPLINARY RECORDS

REQUEST NO. 41: Complete personnel files for WINSTON H. "WINK" YEARY JR., JOHN DOE OFFICERS 1-2, BJ BURKHART, JOHN DOE JAILER "JJ", JANE DOE JAILER 1, and JOHN DOE JAILERS 2-6, including:

    a. Employment applications and hiring documents;

    b. Training records and certifications;

    c. Performance evaluations;

    d. Disciplinary records and complaints;

    e. Use of force incidents and reports;

    f. Internal affairs investigations;

    g. Commendations and awards.

REQUEST NO. 42: All complaints filed against Defendant officers within the past five (5) years, including complaints of excessive force, false arrest, denial of medical care, or constitutional violations.

REQUEST NO. 43: All documents showing disciplinary action taken or not taken in response to complaints against Defendant officers.

## K. MONELL EVIDENCE - POLICIES, CUSTOMS, AND PRACTICES

REQUEST NO. 44: All documents showing policies, customs, or practices of arresting individuals without investigating jurisdiction when indicators of special status are present.

REQUEST NO. 45: All documents showing failure to train officers on jurisdictional requirements under Kentucky precedent.

REQUEST NO. 46: All documents showing pattern or practice of using OC spray on non-resistant detainees.

REQUEST NO. 47: All documents showing pattern or practice of prolonged restraint chair use constituting torture.

REQUEST NO. 48: All documents showing pattern or practice of denying medical care to detainees.

REQUEST NO. 49: All documents concerning Chief Yeary's knowledge, approval, or ratification of the constitutional violations alleged in the Complaint.

REQUEST NO. 50: All documents showing Jailer Burkhart's knowledge, approval, or supervision of the torture and abuse of Plaintiff.

## L. CHIEF YEARY'S PERSONAL INVOLVEMENT

REQUEST NO. 51: All documents concerning Chief Yeary's personal appearance during Plaintiff's release on October 17, 2025.

REQUEST NO. 52: All documents concerning Chief Yeary's participation in or supervision of officers ripping paperwork from Plaintiff's hands.

REQUEST NO. 53: All documents concerning Chief Yeary's threats to revoke Plaintiff's bail and subject Plaintiff to additional OC spray torture "or worse."

REQUEST NO. 54: All communications to or from Chief Yeary concerning Plaintiff from October 16-17, 2025.

## M. EVIDENCE PRESERVATION AND SPOLIATION

REQUEST NO. 55: All documents concerning Plaintiff's written demands for preservation of evidence, including correspondence with Plaintiff regarding public records requests.

REQUEST NO. 56: All documents concerning Kentucky Attorney General's decision dated December 23, 2025, regarding Plaintiff's appeal of denied public records requests.

REQUEST NO. 57: All documents concerning evidence retention policies for body camera footage, surveillance video, and dispatch audio.

REQUEST NO. 58: All documents showing when body camera footage, surveillance video, or dispatch audio from October 16-17, 2025, was scheduled for deletion or destruction.

6 of 8

REQUEST NO. 59: All documents showing any deletion, destruction, alteration, or modification of evidence related to Plaintiff's case.

REQUEST NO. 60: All litigation hold notices or preservation orders issued concerning evidence related to Plaintiff's case.

## N. HUDDLE HOUSE AND PRECIPITATING EVENTS

REQUEST NO. 61: All documents concerning communications between Huddle House and law enforcement on October 16, 2025.

REQUEST NO. 62: All documents concerning the call or report that precipitated the traffic stop of Plaintiff.

REQUEST NO. 63: All documents concerning COLES AUTOBODY AND TOWING's involvement in towing or impounding the GNARLEY Ministry Trust's automobile.

REQUEST NO. 64: All documents showing financial arrangements between COLES AUTOBODY AND TOWING and Defendants.

## O. RELATED INCIDENTS AND PATTERN EVIDENCE

REQUEST NO. 65: All documents concerning other incidents where officers arrested individuals without investigating jurisdiction when indicators of special status were present.

REQUEST NO. 66: All documents concerning other incidents where officers used OC spray on non-resistant detainees.

REQUEST NO. 67: All documents concerning other incidents where detainees were held in restraint chairs for prolonged periods (six hours or more).

REQUEST NO. 68: All documents concerning other incidents where detainees requested medical care and were denied.

REQUEST NO. 69: All documents concerning complaints or lawsuits filed against Defendants within the past five (5) years alleging excessive force, false arrest, torture, or denial of medical care.

## P. CORPORATE REGISTRATION AND DUNS

REQUEST NO. 70: All documents showing the corporate registration of CITY OF HARLAN, KENTUCKY and HARLAN COUNTY, KENTUCKY, including DUNS numbers, articles of incorporation, and corporate status.

REQUEST NO. 71: All documents concerning the State of Kentucky's DUNS number 089737716 or any related corporate registration.

## Q. MIRANDA WARNINGS AND FIFTH AMENDMENT

REQUEST NO. 72: All documents showing Miranda warnings were provided to Plaintiff at any time during his arrest, detention, or interrogation.

REQUEST NO. 73: All documents concerning any statements made by Plaintiff during custodial interrogation on October 16-17, 2025.

7 of 8

## R. DAMAGES AND INJURIES

REQUEST NO. 74: All photographs, videos, or other visual documentation of Plaintiff's injuries from the Incident.

REQUEST NO. 75: All medical records, including emergency room records, if Plaintiff was transported for medical care (which he was not, demonstrating deliberate indifference).

REQUEST NO. 76: All documents concerning harm to horses or other property belonging to Plaintiff or the GNARLEY Ministry Trust resulting from Plaintiff's unlawful detention.

Dated this 02 day of January , 2026.

Respectfully Filed,

William Bolt, agent / WILLIAM MATTHEW BOLT, principle
William Bolt, agent and trustee
Attorney-in-fact for WILLIAM MATTHEW BOLT
Freeman of the Union
WITHOUT the "United States" at all times
Sultan of the Nation of GNAR
Ambassador of the Nation of GNAR
Ambassador of the Nation of Pluto Coalition
Non-citizen national, 8 U.S.C. § 1101(a)(14)
Internationally protected person
All rights reserved pursuant to UCC 1-308


**CONTACT INFORMATION:**

William Bolt
c/o Carol Bolt
5264 S. Liberty Pike
Liberty, IN 47353
Phone: (970) 409-8417

8 of 8

Eastern District of Kentucky
FILED

JAN - 2 2026

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# LEXINGTON DIVISION

**William Bolt, agent /**
**WILLIAM MATTHEW BOLT, principal;**

Case No.: 6:26-cv-54

**Plaintiff,**

v.

CITY OF HARLAN, KENTUCKY;
WINSTON H. "WINK" YEARY JR., individually and in his official capacity as City of
Harlan, Kentucky, Chief of Police;
JOHN DOE OFFICERS 1-2, individually and in their official capacities as City of
Harlan, Kentucky, Police Officers;
HARLAN COUNTY, KENTUCKY;
BJ BURKHART, individually and in his official capacity as Harlan County Jailer;
JOHN DOE JAILER "JJ", individually and in his official capacity;
JANE DOE JAILER 1, individually and in her official capacity;
JOHN DOE JAILERS 2-6, individually and in their official capacities;
JOHN DOE SHERIFF DEPUTY, individually and in his official capacity
HUDDLE HOUSE, INC.;
JANE DOE HUDDLE HOUSE MANAGER;
COLES AUTOBODY AND TOWING;
JOHN DOE DEFENDANTS 7-12,

**Defendants.**

---

# NOTICE OF SPECIAL APPEARANCE, STATUS, AND RESERVATION OF RIGHTS

---

## I. NATURE OF THIS APPEARANCE

William Bolt appears specially and not generally for the limited purpose of protecting
rights and seeking redress for constitutional violations, WITHOUT waiving any
jurisdictional challenges or rights. This special appearance is made to contest unlawful
actions taken WITHOUT jurisdiction and to preserve all rights under common law,

*1 of 7*

constitutional law, and the law of nations. William Bolt expressly reserves all rights WITHOUT prejudice pursuant to UCC 1-308.

## II. STATUS OF PARTIES

William Bolt is a living man, he bleeds if he is cut, and a freeman of the Union. William Bolt is NOT a corporate fiction, artificial entity, corporation, animal, ship, cargo, or any other fiction as such. William Bolt acts as agent and trustee for WILLIAM MATTHEW BOLT, an ens legis commercial entity organized as a sole proprietorship. The GNARLEY Ministry Trust is a separate legal entity and property owner of which Defendants trespassed. William Bolt is trustee of the GNARLEY Ministry Trust.

William Bolt is Sultan of the Nation of GNAR and Ambassador of both the Nation of GNAR and the Nation of Pluto Coalition, which are foreign governments at peace with the corporation "United States" per 18 U.S.C. § 11. William Bolt is a non-citizen national as defined by 8 U.S.C. § 1101(a)(14), an internationally protected person, and operates WITHOUT the "United States" at all times pursuant to 28 U.S.C. § 3002(15)(A) and UCC 9-307(h).

## III. JURISDICTIONAL FOUNDATION AND LEGAL FRAMEWORK

### A. Burden of Proof on Party Asserting Jurisdiction

Under established precedent, the party asserting jurisdiction bears the burden of proving that jurisdiction exists. Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). Defendants arrested and detained William Bolt based on alleged code violations without first establishing that they possessed jurisdiction over him. The burden was on Defendants to prove jurisdiction before taking action. Defendants failed to meet this burden.

### B. Physical Presence Does Not Establish Domicile or Jurisdiction

The Supreme Court held in Texas v. Florida, 306 U.S. 398, 424 (1939), that "residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile." Physical presence alone is insufficient to establish domicile or jurisdiction. The Court further stated that "physical facts of residence, united with major life interests may fix domicile—one's 'preeminent headquarters.'" Id. at 426. The burden of proof is on one who claims that an earlier domicile was abandoned for a later one. Id. at 427.

William Bolt was merely traveling through Harlan County, Kentucky on October 16, 2025. He established no domicile in Kentucky, conducted no business in Kentucky, and had no life interests in Kentucky. His physical presence while traveling does not establish Kentucky's jurisdiction over him.

2 of 7

## C. Minimum Contacts and Due Process Requirements

In World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 294 (1980), the Supreme Court held that "the Due Process Clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations." The Court emphasized that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being hailed into court there." Id. at 297.

William Bolt, operating as a non-citizen national pursuant to 8 U.S.C. § 1101(a)(14) and presenting diplomatic credentials evidencing his federal status, had no jurisdictional contacts, ties, or relations with the State of Kentucky corporate entity (DUNS #089737716) that would permit Defendants to lawfully detain, restrain, or exercise authority over him. The Due Process Clause acts as "an instrument of interstate federalism" that "may sometimes act to divest the State of its power to render a valid judgment." Id. at 294.

## D. Kentucky Precedent Requiring Jurisdictional Investigation Before Action

Kentucky law and precedent established in Ex Parte Knowles, 5 Cal. 301-307 (1855) and reaffirmed in Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013), clearly require that when indicators of special status or jurisdiction are present, officers MUST investigate jurisdiction BEFORE taking any action against an individual. NO ACTION CAN BE TAKEN UNLESS JURISDICTION IS FIRST PROVEN.

On October 16, 2025, William Bolt's automobile displayed a Diplomatic Ambassador At Large plate, clearly visible indicators that required the Defendant Officers to investigate jurisdiction before proceeding. William Bolt verbally communicated his status as Ambassador, non-citizen national, and internationally protected person. William Bolt offered to provide written documentation supporting his status. These were clear INDICATORS requiring jurisdictional investigation under Kentucky precedent.

The Defendant Officers conducted NO investigation of jurisdiction. They made NO inquiry into William Bolt's status. They took NO steps to verify or investigate William Bolt's claims before arresting him. This complete failure to investigate jurisdiction despite clear indicators violates Kentucky precedent established and constitutes a violation of due process.

## E. Territorial Limits on State Jurisdiction

In Pennoyer v. Neff, 95 U.S. 714, 722 (1877), the Supreme Court established that "every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory." However, the Court also held that "no State can exercise direct jurisdiction and authority over persons or property without its territory." The question of whether an individual is "within the territory" for purposes of state jurisdiction depends on domicile, not mere physical presence.

3 of 7

William Bolt operates WITHOUT the territorial jurisdiction of "the United States" (as defined by 28 U.S.C. § 3002(15)(A)) at all times. Under UCC 9-307(h), "The United States is located in the District of Columbia." William Bolt was traveling in Kentucky, one of the Union states, NOT within "the United States" (federal corporation's territorial jurisdiction limited to District of Columbia, federal enclaves, territories, and possessions).

## F. Privacy Act Requirements for Information Collection

Under the Privacy Act of 1974, 5 U.S.C. § 552a(e)(3), agencies collecting information from individuals must inform them of: (a) the authority (statute or executive order) authorizing the solicitation of information and whether disclosure is mandatory or voluntary; (b) the principal purposes for which the information is intended to be used; (c) routine uses which may be made of the information; and (d) the effects of not providing all or any part of the requested information.

Defendants demanded that William Bolt provide state-issued identification and personal information without informing him of any statutory authority authorizing such demands, without informing him whether disclosure was mandatory or voluntary, and without explaining the consequences of not providing the information. This violated the Privacy Act and demonstrated that Defendants had no lawful basis to compel William Bolt to provide personal information.

## G. Right to Travel Without Commercial Regulation

The Supreme Court has long recognized that citizens have a fundamental right to travel. Kent v. Dulles, 357 U.S. 116, 125 (1958). In Thompson v. Smith, 155 Va. 367, 372-373 (1930), the Virginia Supreme Court held that "the right of a citizen to travel upon the highway and to transport his property thereon in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain." The Court further stated that "the former is the usual and ordinary right of a citizen, a right common to all, while the latter is special, unusual, and extraordinary."

William Bolt was traveling in the ordinary course of life, not engaged in commercial activity on the highways. He was operating as a private traveler exercising his natural right to travel, not as a "driver" of a "motor vehicle" engaged in commerce as those terms are defined in 18 U.S.C. § 31 and 19 U.S.C. § 4571. Defendants had no authority to stop, detain, or arrest William Bolt for alleged violations of commercial vehicle regulations that do not apply to private travel.

## H. No Duty to Carry or Produce Identification

The Police Manual of Arrest, Eighth Edition, Section 21, pages 94-95, states: "The common law does not require a citizen to identify himself or carry identification of any sort. Therefore, while it may be the mark of a good citizen to identify himself when asked to do so, a police officer must not use force to compel someone to identify."

4 of 7

Defendants demanded that William Bolt produce state-issued identification and used prolonged detention, threats, and torture to attempt to coerce compliance. William Bolt had no legal duty to carry or produce such identification. Defendants' use of force, threats, and torture to compel identification violated established law enforcement standards and constitutional protections.

## IV. FACTUAL BASIS FOR LACK OF JURISDICTION

On October 16, 2025, at approximately 6:00 p.m. Eastern Time, Defendant Officers of the Harlan City Police Department stopped William Bolt's automobile in Harlan, Kentucky. The automobile, owned by the GNARLEY Ministry Trust, displayed Diplomatic Ambassador At Large license plates on the rear of the vehicle. These plates are official indicators of William Bolt's status as Ambassador and internationally protected person, analogous to diplomatic license plates issued to foreign embassy personnel.

Upon approach by the Defendant Officers, William Bolt immediately and clearly communicated his status. William Bolt informed the officers that: (a) he is William Bolt, agent and trustee for WILLIAM MATTHEW BOLT; (b) he is a non-citizen national under 8 U.S.C. § 1101(a)(14); (c) he is Sultan of the Nation of GNAR; (d) he is Ambassador of the Nation of GNAR and Nation of Pluto Coalition; (e) the Nation of GNAR and Nation of Pluto Coalition are foreign governments at peace with the "United States" per 18 U.S.C. § 11; (f) he is an internationally protected person; (g) he operates WITHOUT the territorial jurisdiction of "the United States" at all times; (h) he is a freeman of the Union traveling under natural right; (i) the automobile is property of the GNARLEY Ministry Trust; and (j) he is traveling, not "driving" a "motor vehicle" engaged in commerce.

William Bolt offered to provide written documentation supporting his status, including documents establishing his position as Sultan and Ambassador, his non-citizen national status, and the Trust's ownership of the automobile. The Defendant Officers refused to examine William Bolt's documentation and refused to investigate the jurisdictional issues presented by the diplomatic plates and William Bolt's verbal communications.

Kentucky precedent requires that when indicators of special status or jurisdiction are present—such as diplomatic plates and verbal communications of ambassador status—officers MUST investigate jurisdiction BEFORE taking action. The Defendant Officers' complete failure to investigate jurisdiction violated clearly established Kentucky law established in Ex Parte Knowles (1855) and reaffirmed in Wilson v. Commonwealth (2013).

Despite the lack of jurisdiction, the lack of probable cause, the lack of a warrant, and William Bolt's clear communications regarding his status, the Defendant Officers proceeded to arrest William Bolt. The arrest was unlawful from its inception. Every moment of detention that followed was unlawful trespass against William Bolt's person and property.

5 of 7

## V. CONSEQUENCES OF LACK OF JURISDICTION

All actions taken by Defendants were WITHOUT jurisdiction, WITHOUT consent, and constitute unlawful trespass upon William Bolt's person, property, and rights, as well as trespass against Trust-owned and Trust-managed property. Because Defendants lacked jurisdiction, all proceedings, charges, detentions, and actions taken against William Bolt are void ab initio—void from the beginning.

An action taken without jurisdiction is a nullity and cannot be ratified or validated by subsequent proceedings. The unlawful arrest led directly to William Bolt's detention at the Harlan County Detention Center, where he was subjected to torture including chemical weapon assault with oleoresin capsicum (OC) spray, twelve hours of continuous restraint in a restraint chair, sexual assault, denial of medical care, and other constitutional violations detailed in the accompanying Complaint.

## VI. RESERVATION OF RIGHTS

William Bolt expressly reserves all rights WITHOUT prejudice pursuant to UCC 1-308 (formerly UCC 1-207), which provides: "A party who with explicit reservation of rights performs or promises performance or asserts to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved."

By appearing in this Court to seek redress for constitutional violations, William Bolt does not waive any jurisdictional challenges, does not consent to jurisdiction where none exists, and does not waive any rights under common law, constitutional law, or the law of nations. This appearance is special and limited in nature, made solely for the purpose of protecting rights and seeking remedies for the torts and constitutional violations committed by Defendants.

## VII. PRAYER FOR RECOGNITION

WHEREFORE, William Bolt respectfully requests that this Court:

A. Recognize this special appearance and the limited nature of William Bolt's participation in these proceedings;

B. Recognize William Bolt's status as agent and trustee for WILLIAM MATTHEW BOLT, Ambassador of the Nation of GNAR and Nation of Pluto Coalition, non-citizen national under 8 U.S.C. § 1101(a)(14), and internationally protected person;

C. Recognize that Defendants lacked jurisdiction to arrest, detain, or take any action against William Bolt on October 16-17, 2025;

D. Recognize that all actions taken by Defendants without jurisdiction are void ab initio;

E. Grant all relief requested in the accompanying Complaint; and

6 of 7

F. Grant such other and further relief as this Court deems just and proper.

**RESPECTFULLY FILED this** 02 **day of** January , 2026.

William Bolt, agent and trustee
Attorney-in-fact for WILLIAM MATTHEW BOLT
Freeman of the Union
WITHOUT the "United States" at all times
Sultan of the Nation of GNAR
Ambassador of the Nation of GNAR
Ambassador of the Nation of Pluto Coalition
Non-citizen national, 8 U.S.C. § 1101(a)(14)
Internationally protected person
All rights reserved pursuant to UCC 1-308

## CONTACT INFORMATION:

William Bolt
c/o Carol Bolt
5264 S. Liberty Pike
Liberty, IN 47353
Phone: (970) 409-8417

## CERTIFICATE OF SERVICE

I hereby certify that on this 02 day of January , 2026, I caused a true and correct copy of the foregoing NOTICE OF SPECIAL APPEARANCE to be served upon all known Defendants by U.S. Marshall at their addresses as listed in the Complaint, and will be served upon any unidentified Defendants immediately upon discovery.

William Bolt, agent and trustee
All rights reserved pursuant to UCC 1-308

## END OF NOTICE OF SPECIAL APPEARANCE

7 of 7

Eastern District of Kentucky
FILED

JAN - 2 2026

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

William Bolt, agent;
 WILLIAM MATTHEW BOLT, principal;

Case No.: 6:26-cv-54

Plaintiff,

v.

CITY OF HARLAN, KENTUCKY;
WINSTON H. "WINK" YEARY JR., individually and in his official capacity as City of Harlan, Kentucky, Chief of Police;
JOHN DOE OFFICERS 1-2, individually and in their official capacities as City of Harlan, Kentucky, Police Officers;
HARLAN COUNTY, KENTUCKY;
BJ BURKHART, individually and in his official capacity as Harlan County Jailer;
JOHN DOE JAILER "JJ", individually and in his official capacity;
JANE DOE JAILER 1, individually and in her official capacity;
JOHN DOE JAILERS 2-6, individually and in their official capacities;
JOHN DOE SHERIFF DEPUTY, individually and in his official capacity
HUDDLE HOUSE, INC.;
JANE DOE HUDDLE HOUSE MANAGER;
COLES AUTOBODY AND TOWING;
JOHN DOE DEFENDANTS 7-12,

Defendants.

---

## PROPOSED ORDER GRANTING EMERGENCY MOTION FOR EXPEDITED DISCOVERY AND PRESERVATION OF EVIDENCE

This matter having come before the Court on Plaintiff's Emergency Motion for Expedited Discovery and Preservation of Evidence, and the Court having reviewed the motion, memorandum in support, and all materials submitted, and finding that:

1. Good cause exists for expedited discovery and inspection of records, pursuant to Federal Rule of Civil Procedure 26(d)(1) and the standard set forth in Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority, 242 F.R.D. 139, 142 (D.D.C. 2007);

2. Critical evidence of alleged torture, constitutional violations, and civil rights deprivations is at imminent risk of destruction;

3. Approximately Eighty (80) days have elapsed since the incident of October 16-17, 2025, and standard law enforcement video and audio retention periods of 30-90 days are expiring;

1 of 7

4. Despite written demands for preservation, Defendants have refused to preserve evidence, claiming Plaintiff lacks standing under Kentucky open records law;

5. The evidence sought is necessary to adequately prepare and prove Plaintiff's claims, is not otherwise available, and faces imminent danger of loss or destruction pursuant to the three-part test for good cause;

6. Defendants have demonstrated willingness to falsify records by documenting OC spray as administered from "four feet" when Plaintiff alleges point-blank administration, creating substantial risk of spoliation;

7. This Court possesses inherent authority to preserve evidence and prevent spoliation pursuant to Halas v. Consumer Safety Glazing Committee, 80 F.R.D. 346, 348 (N.D. Ill. 1978);

## NOW, THEREFORE, IT IS HEREBY ORDERED:

### I. IMMEDIATE PRESERVATION OF EVIDENCE

1. Defendants CITY OF HARLAN, KENTUCKY; WINSTON H. "WINK" YEARY JR.; JOHN DOE OFFICERS 1-2; HARLAN COUNTY, KENTUCKY; BJ BURKHART; JOHN DOE JAILER "JJ"; JANE DOE JAILER 1; JOHN DOE JAILERS 2-6; HUDDLE HOUSE, INC.; JANE DOE HUDDLE HOUSE MANAGER; COLES AUTOBODY AND TOWING; and JOHN DOE DEFENDANTS 7-12 shall IMMEDIATELY implement a litigation hold preserving all evidence related to the arrest, detention, and treatment of Plaintiff William Bolt on October 16-17, 2025.

2. The litigation hold shall apply to all evidence in Defendants' possession, custody, or control, including but not limited to:

   a.  All body-worn camera footage from Harlan City Police officers from October 16-17, 2025;

   b. All jail surveillance video from Harlan County Detention Center located at 6000 KY-38, Evarts, KY 40828, from October 16-17, 2025, including footage from processing areas, restraint chair locations, cells, and release areas;

   c. All dispatch audio recordings from October 16-17, 2025;

   d. All incident reports, arrest reports, booking records, and detention records;

   e. All use of force reports, including reports falsely documenting OC spray administration from "four feet," and restraint chair authorization and monitoring logs;

   f. All medical screening records, medical treatment records, and medical evaluation records;

   g. All release paperwork and documentation;

   h. All emails, text messages, memoranda, and other communications related to Plaintiff's arrest, detention, or treatment;

   i. All policies, procedures, training materials, and manuals in effect on October 16-17, 2025;

   j. All personnel files for officers involved in Plaintiff's arrest and detention;

2 of 7

k. All financial records including CUSIP numbers, bond instruments, EIN documentation, tax forms (Forms 1099, 8281, and other IRS documents), and revenue records related to arrests and detentions;

l. All documents related to grants, incentives, or payments received based on arrest statistics or detention rates;

m. All documents concerning jurisdictional investigation or lack thereof;

n. All documents concerning Chief Yeary's personal appearance during Plaintiff's release and threats made.

3. Defendants shall suspend all routine document retention and destruction policies as they apply to the evidence described above.

4. Defendants shall take all necessary steps to ensure that no evidence is deleted, destroyed, altered, or modified in any way.

## II. CERTIFICATION OF COMPLIANCE

1. Within TWO (2) DAYS of the date of this Order, Defendants shall provide written certification to Plaintiff and to this Court that the litigation hold has been implemented. The certification shall be signed by counsel for Defendants and shall identify:

a. The specific individuals responsible for implementing the litigation hold;

b. The specific systems, servers, and storage locations where evidence is maintained;

c. The steps taken to suspend automatic deletion or destruction;

d. Confirmation that all custodians of evidence have been notified of their preservation obligations;

e. Confirmation that no evidence has been deleted or destroyed since October 16, 2025, or disclosure of any evidence that has been deleted or destroyed.

## III. EXPEDITED PRODUCTION - VIDEO AND AUDIO EVIDENCE

1. Within FIVE (5) DAYS of the date of this Order, Defendants shall produce to Plaintiff in a usable electronic format:

a. All body-worn camera footage from Harlan City Police officers from October 16 -17, 2025, showing the traffic stop, Plaintiff's communications regarding status and jurisdiction, officers' response or lack thereof, arrest, and transport;

b. All jail surveillance video from Harlan County Detention Center from October 16- 17, 2025, including footage showing: intake and processing; the point-blank OC spray attack; Plaintiff being placed in restraint chair; the twelve-hour restraint period; application of contaminated water to Plaintiff's genitals; Plaintiff's requests for medical care; gang intimidation by multiple officers; Chief Yeary's presence during release; and officers ripping paperwork from Plaintiff's hands;

c. All dispatch audio recordings from October 16-17, 2025, including any communications regarding jurisdictional issues, Plaintiff's status, use of force, medical issues, or Chief Yeary's involvement;

3 of 7

    d. All incident reports, arrest reports, booking records, use of force reports (including the false "four feet" report), restraint chair logs, and medical records related to Plaintiff's arrest and detention.

2. Video and audio evidence shall be produced in native format with metadata intact. Defendants shall not compress, redact, or alter the evidence in any way except as specifically authorized by this Court after notice and opportunity to be heard.

## IV. EXPEDITED PRODUCTION - FINANCIAL RECORDS

1. Within FOURTEEN (14) DAYS of the date of this Order, Defendants shall produce to Plaintiff:

    a. All documents showing any CUSIP number, bond instrument, financial security, or debt obligation created, issued, assigned, or associated with the arrest, detention, or prosecution of William Bolt on October 16-17, 2025, including any securitization of said case for investment, trading, or revenue generation purposes;

    b. The Employer Identification Number (EIN) under which any revenue, interest, or financial benefit derived from Plaintiff's case was reported to the Internal Revenue Service, including all Forms 1099, 8281, and other tax documents related to financial instruments;

    c. All documents showing payments, revenues, incentives, grants, or other financial benefits received based on arrest rates, detention statistics, or case filings for the period including October 2025;

    d. Complete chain of title for any financial instruments related to Plaintiff's case, from creation through current ownership;

    e. All contracts, agreements, or arrangements with financial institutions, investment entities, or government agencies related to monetization of arrests, detentions, or prosecutions;

    f. Pursuant to UCC § 9-210, accounting of any unpaid obligations secured by collateral, list of collateral securing obligations, and statement of account showing aggregate amount owed. Defendants shall comply with the fourteen-day response requirement under UCC § 9-210.

## V. EXPEDITED PRODUCTION - POLICIES AND PERSONNEL FILES

1. Within TWENTY-ONE (21) DAYS of the date of this Order, Defendants shall produce to Plaintiff:

    a. All policies, procedures, training materials, and manuals in effect on October 16-17, 2025, regarding:

        i. Jurisdictional investigation requirements, including training on Ex Parte Knowles, 5 Cal. 301-307 (1855) and Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013);

        ii. Traffic stops and arrest procedures;

        iii. Constitutional rights of non-citizen nationals under 8 U.S.C. § 1101(a)(14);

        iv. Internationally protected persons and diplomatic credentials;

> v. Use of force, chemical weapons, and OC spray;
>
> vi. Restraint chair use and monitoring;
>
> vii. Medical care duties and responses to medical emergencies;
>
> viii. Strip search procedures;
>
> ix. The Police Manual of Arrest § 21 regarding identification requirements;
>
> x. Privacy Act of 1974 compliance under 5 U.S.C. § 552a(e)(3);

b. All training records for WINSTON H. "WINK" YEARY JR., JOHN DOE OFFICERS 1-2, BJ BURKHART, JOHN DOE JAILER "JJ", JANE DOE JAILER 1, and JOHN DOE JAILERS 2-6;

c. All personnel files for said officers including prior complaints, disciplinary records, use of force incidents, and internal affairs investigations.

## VI. RULE 34 RESPONSES

1. Defendants shall respond to Plaintiff's Rule 34 Request for Production of Documents (filed concurrently with the Emergency Motion) within THIRTY (30) DAYS of the date of this Order.

## VII. SANCTIONS FOR NON-COMPLIANCE - SPOLIATION

1. If Defendants fail to preserve evidence as ordered, or if evidence has already been destroyed, this Court shall impose the following sanctions pursuant to Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003):

   a. Adverse inference that destroyed evidence would have supported Plaintiff's claims and proven Defendants' liability;

   b. Adverse inference that the destroyed evidence would have shown:
      (i) point-blank administration of OC spray rather than "four feet";
      (ii) twelve hours of restraint chair torture;
      (iii) sexual assault with OC spray to genitals;
      (iv) denial of medical care;
      (v) no jurisdictional investigation despite clear indicators;
      (vi) Chief Yeary's personal supervision and threats; and
      (vii) any other facts alleged by Plaintiff;

   c. Monetary sanctions of TEN THOUSAND U.S. DOLLARS ($10,000.00) per item of destroyed evidence, payable to Plaintiff;

   d. Striking of Defendants' defenses and answers;

   e. Default judgment in favor of Plaintiff;

   f. Such other sanctions as the Court deems appropriate.

2. If Defendants fail to timely produce evidence as ordered, this Court shall impose monetary sanctions of FIVE THOUSAND DOLLARS ($5,000.00) per day for each day of delay beyond the deadlines set forth in this Order, payable to Plaintiff.

3. If evidence has already been destroyed prior to the date of this Order, Defendants shall immediately notify this Court and Plaintiff in writing within TWO (2) DAYS, identifying:    (a) what evidence was destroyed;

> (b) when it was destroyed;
>
> (c) under what circumstances;
>
> (d) who authorized or performed the destruction; and
>
> (e) whether the destruction occurred before or after Plaintiff's written preservation demands. The Court will then determine appropriate sanctions including those enumerated in paragraph 11 above.

## VIII. BURDEN OF PROOF ON JURISDICTION

1. Consistent with Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974), the burden of proving jurisdiction rested on Defendants before taking action against Plaintiff. Defendants' failure to investigate jurisdiction before arrest despite clear indicators (diplomatic plates, verbal communications of status) violated Kentucky precedent established in Ex Parte Knowles, 5 Cal. 301-307 (1855) and reaffirmed in Wilson v. Commonwealth, 403 S.W.3d 710 (Ky. 2013).

## IX. NO WAIVER OF CLAIMS OR DEFENSES

1. Nothing in this Order shall be construed as a waiver of any claims, defenses, objections, or privileges that any party may assert, except that:

   a. Defendants may not assert that evidence was destroyed pursuant to routine retention policies after the date of this Order;

   b. Defendants may not assert that evidence was destroyed pursuant to routine retention policies after receiving Plaintiff's written preservation demands;

   c. Defendants may not claim qualified immunity as a defense to spoliation sanctions.

## X. PROTECTIVE ORDER

1. The parties shall meet and confer within TEN (10) DAYS regarding the need for a protective order governing the use and dissemination of evidence produced pursuant to this Order, including but not limited to body camera footage, jail surveillance video, and medical records. If the parties cannot agree, either party may move for entry of a protective order within FOURTEEN (14) DAYS.

## XI. COSTS AND FEES

1. Defendants shall bear all costs associated with producing evidence required by this Order, including costs of copying, conversion to electronic format, and delivery to Plaintiff.

2. If Defendants fail to comply with this Order, Plaintiff may seek recovery of reasonable attorneys' fees and costs incurred in seeking enforcement of this Order or sanctions for non-compliance.

## XII. AUTHORITY AND FINDINGS

1. This Order is issued pursuant to Federal Rules of Civil Procedure 26 and 34, and this Court's inherent authority to preserve evidence and prevent spoliation as recognized in Halas v. Consumer Safety Glazing Committee, 80 F.R.D. 346, 348 (N.D. Ill. 1978).

6 of 7

2. The Court finds that the three-part test for good cause under Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority, 242 F.R.D. 139, 142 (D.D.C. 2007) is satisfied:

    a. The evidence is necessary to adequately prepare and prove Plaintiff's claims of torture under 18 U.S.C. § 2340A and constitutional violations;

    b. The evidence is not otherwise available to Plaintiff and is in Defendants' exclusive possession, custody, and control;

    c. There is imminent danger the evidence will be lost or destroyed given the passage of 77 days, standard 30-90 day retention periods, Defendants' refusal to preserve despite written demands, and demonstrated willingness to falsify records.

**IT IS SO ORDERED.**


Dated this _____ day of _____, 2026 .


_____

HONORABLE _____
UNITED STATES DISTRICT JUDGE

130905

AO82
(Rev. 8/03)

**RECEIPT FOR PAYMENT**
**UNITED STATES DISTRICT COURT**
**for the**
**EASTERN DISTRICT OF KENTUCKY**

at _Covington_

RECEIVED FROM  _William Bolt_

_5264 S. Liberty Pike_

_Liberty, IN 47353_

Fund
6855XX Deposit Funds
604700 Registry Funds
General and Special Funds
508800 Immigration Fees
085000 Attorney Admission Fees
086900 Filing Fees
0869PL Filing Fee Prisoner Lit.
322340 Sale of Publications
322350 Copy Fees
322360 Miscellaneous Fees
143500 Interest
322380 Recoveries of Court Costs
322386 Restitution to U.S. Government
109900 Misc. Fines, Penalties, etc.
121000 Conscience Fund
129900 Gifts
504100 Crime Victims Fund
613300 Unclaimed Monies
510000 Filings Spec. Acct
5100PL Filings Spec. Acct. Prisoner Lit.
510100 Registry Admin. Acct.
5114CR Electronic Copy Fee

| ACCOUNT | AMOUNT | |
|---|---|---|
| 086900 | 405 | 00 |
| | | |
| | | |

TOTAL  405.00
Case Number or Other Reference
6:26-cv-54-CHB

Checks and drafts are accepted subject to collection and full credit will only be given when the check or draft has been accepted by the financial institution on which it was drawn.

| DATE | Cash | Check | M.O. | Credit | DEPUTY CLERK: |
|---|---|---|---|---|---|
| January 2 2026 | | | | ✓ | _Jeffrey B_ |

☆ U.S. GOVERNMENT PRINTING OFFICE: 2004-636-328